---

## In re RICE et al.

(Circuit Court, M. D. Alabama, N. D. Aug. 2, 1910.)

1. CONTEMPT (§ 27*)—CONDONATION.

   Where a violation of orders of the court affects only the right litigated between parties to the suit, it may be condoned; but, where the disobedience evinces a deliberate purpose to contemn the authority of the court, the consequences reach beyond the private right, and a disobedience becomes an offense against the government which the court is bound to notice and punish.

   [Ed. Note.—For other cases, see Contempt, Cent. Dig. § 5; Dec. Dig. § 27.*]

2. CONTEMPT (§§ 3, 4*)—"CIVIL CONTEMPT"—"CRIMINAL CONTEMPT."

   A "civil contempt" is one affecting only the rights of parties litigant, while a "criminal contempt" is one evincing a deliberate purpose to contemn the authority of the court.

   [Ed. Note.—For other cases, see Contempt, Cent. Dig. § 4; Dec. Dig. §§ 3, 4.*

   For other definitions, see Words and Phrases, vol. 2, p. 1194; vol. 2, pp. 1747, 1748.]

3. CONTEMPT (§ 54*)—PROCEEDINGS—OBJECTIONS—TIME.

   An objection that a contempt proceeding was based on a rule issued on a complaint made on information and belief supported by an affidavit of the same character was too late, where it was not raised until after the alleged contemnor had admitted the act charged and had stated in defense, that the act was done in ignorance of the order.

   [Ed. Note.—For other cases, see Contempt, Cent. Dig. § 147; Dec. Dig. § 54.*]

4. INJUNCTION (§ 228*)—VIOLATION—LIABILITY OF AGENT.

   Where an attorney at law, who is also his client's attorney in fact and legal adviser, acts in violation of an injunction in the name of his client carrying out the client's command and has knowledge of the injunction, he is guilty of contempt, though he is not a party to the suit in which the

injunction has been granted under the rule that an injunction, though not addressed to strangers, is an admonition and order to any one who acts in the assertion of the principal's right only, contrary to the terms of the injunction addressed to the principal.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 484–495; Dec. Dig. § 228.*

Liability of attorneys for contempt, see note to Anderson v. Comptois, 48 C. C. A. 7.]

5. CONTEMPT (§ 61*)—TRIAL OF FACTS—INFERENCES.

Courts will not tolerate defiance or evasion of their commands by artifice or contrivance of any kind, but will look behind the form to the substance, and, sitting as trier of the facts as well as the law, in passing on contempts, will draw any inference a jury may legitimately draw from the circumstances.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 188, 192; Dec. Dig. § 61.*]

6. CONTEMPT (§ 17*)—EVASION OF SERVICE.

Though one who anticipates a suit against him may absent himself from the jurisdiction and continue in hiding after return to avoid service of process to compel his appearance without being guilty of contempt, if the intent to evade service is put into execution after the suit is brought, not only to avoid process, but to frustrate any orders which may be issued to establish the proper status of an estate or right in the controversy, such conduct constitutes contempt.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 48–50; Dec. Dig. § 17.*]

7. INJUNCTION (§ 213*)—NOTICE—SERVICE.

A party who had proper notice of an injunction is bound by it, though it is not served on him.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 437; Dec. Dig. § 213.*]

8. INJUNCTION (§ 230*)—VIOLATION—FORM—DENIAL.

Where, in a contempt proceeding for alleged violation of an injunction not served on respondents, proof of their knowledge thereof was not clear, their sworn denial that they had knowledge of the injunction and intent to violate it would be given sufficient weight to relieve them from punishment for contempt.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 508; Dec. Dig. § 230.*]

9. INJUNCTION (§ 230*)—VIOLATION—KNOWLEDGE—EVIDENCE.

On a rule to show cause why respondent should not be punished for contempt in violating an injunction restraining sale of certain corporate stock to others than petitioners, evidence held insufficient to require a finding that respondents had knowledge of the injunction prior to a sale made in alleged violation thereof.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 514; Dec. Dig. § 230.*]

Application by Doherty & Co. to punish Alex Rice and Fred S. Ball for contempt of court in violating an order restraining the sale of certain shares of stock owned by Rice in the Citizens' Light, Heat & Power Company and the Citizens' Light & Power Company. Respondents discharged.

Steiner, Crum & Weil and Tyson, Wilson & Martin, for the motion. Ball & Samford, J. M. Chilton, Rushton & Williams, and Horace Stringfellow, opposed.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

JONES, District Judge. Alex Rice, on May 13, 1910, entered into a contract, in New York, with Doherty & Co., for the sale of 800 shares of stock, owned or controlled by him, in the Citizens' Light, Heat & Power Company, and the Citizens' Light & Power Company, to be delivered on June 15th, upon performance, according to the terms of the contract, of their respective undertakings. On that day the attorneys of Doherty & Co. notified Rice they desired to consummate the contract, and Rice referred them to his attorney, Fred S. Ball, as his representative for that purpose. Differences arose over the construction of some of the provisions of the contract, and, no agreement having been reached, Doherty & Co.'s attorneys notified Ball they wished to make a tender, whereupon Ball replied, in substance, that he had no authority to receive the tender, and no longer represented Rice in that matter. Rice by advice of his counsel went that evening to Birmingham, beyond the jurisdiction of this court.

Doherty & Co. filed their bill in this court the next day, June 16th, praying for specific performance by Rice, making him, the Citizens' Light, Heat & Power Company, and the Citizens' Light & Power Company defendants to the bill, and on the evening of that day, about 6 o'clock, a restraining order issued forbidding Rice from transferring, assigning, or in any manner disposing of the shares of stock in the two corporations named, or the trustees' certificates representing such shares, and forbidding said corporations from making any transfers of said stock upon their books, until the further order of the court. The restraining order was served on Whiting, the secretary and general manager of the two corporations, about 7:20 that evening. Rice returned to the city a little before 7 o'clock of the same evening and went to the house of a friend so that he could not be found or served until the next day. In less than four hours after Rice's return to the city and the service of the order upon an officer of his two codefendants, the stock and trustees' certificates which he had contracted to sell to complainants had been sold and transferred to Tillis, in the very teeth of the terms of the restraining order. In answer to a rule, at the instance of complainants, to show cause why they should not be punished for contempt, Rice and Ball appeared, and, not denying the transfer of the stock and trustees' certificates, averred on oath that they had acted as they did without knowledge or notice, direct or indirect, of the issue of the restraining order, and thereupon a lengthy examination of witnesses was had before the court touching the issues thus raised.

As said by the Supreme Court in Re Debs, 158 U. S. 595, 15 Sup. Ct. 910, 39 L. Ed. 1092, quoting and approving the language of the Supreme Court of Mississippi:

"A court without power to effectually protect itself against the assaults of the lawless, or to enforce its orders, judgments, or decrees against recusant parties before it, would be a disgrace to the legislation and a stigma upon the age which invented it. The power to fine and imprison for contempt from the earliest history of jurisprudence has been regarded as a necessary attribute of a court, without which it could no more exist than without a judge."

A violation of the orders of a court may be of such a nature that it affects only the right litigated between the parties to the suit. A

party may condone such a disobedience, and the powers of the court are exerted to redress the wrong done the party. Where, however, the orders of the court are disobeyed, whether or not there be injury to a litigant, under circumstances which evince a deliberate purpose to contemn the authority of the tribunals set up for the administration of justice and defy their orders, the consequences reach far beyond the private right. The disobedience then becomes an offense against government and society, which the courts must notice and punish, since to leave the evil example unnoticed and unpunished would soon lead to the subversion of order, and the establishment of anarchy in its stead. The disobedience in the one instance is called a "civil contempt," and in the other a "criminal contempt."

The objection that the charge of a violation of the order upon which the rule issued was made on information and belief, supported only by an affidavit of the same character, comes too late, when the alleged contemnor, without raising that point, admits the act charged, and defends himself on the ground that the act was done in ignorance of the existence of the order. The exaction of positive allegations to support the rule to show cause is intended to protect the court from the improvident institution of contempt proceedings and useless investigation as to the breach of their orders which the proof may show were not violated. The reason of the rule ceases when the respondent answers, admitting the act charged, and the omission to make a positive charge in the beginning, is, therefore, not of the slightest consequence in the subsequent phases of the prosecution.

It is insisted that Ball is called to account for a breach of the injunction, an offense, which it is argued, although he acted as agent merely, he cannot commit, since he was not a party to the suit by name or designation, and that the charge against Rice is not sufficiently explicit, being merely that he had "notice of the injunction," wherefore the rule should be discharged as to both respondents, regardless of what the evidence proves.

Undoubtedly, the current of authority is to the effect that the commands and directions of an injunction are not addressed to or binding upon one who is not a party, either by name or designation, and in consequence that a person not so made a party is not subject to committal for a breach of the injunction, which, technically speaking, can be committed only by a party to it. Rice was a party to the suit, and of course could breach the injunction. Ball was Rice's attorney in fact, as well as legal adviser, asserting no right of his own, and acting only in the name of his principal and carrying out his commands. He knew, if he had knowledge of the injunction, that it forbade an agent to do for Rice that which it forbade Rice to do. On principle it would seem, whatever the holding of some of the authorities to the contrary, that the directions and commands of an injunction, though not addressed to strangers, are admonitions and orders to any one, although not named in any way in the suit, who acts in the assertion of the principal's right only, contrary to the terms of an injunction addressed to his principal, and that a mere agent may, in that way, be guilty of its breach, in the proper sense. He claims under one to whom the in-

junction speaks, acts for him only, and intentionally puts himself in privity with him, and in consequence is amenable to its commands.

It is not necessary in the posture of this case to decide whether the above objections are well taken. The acts charged against respondents concern the authority and dignity of the court, and a high sense of public duty would compel it to issue a new rule to cover any contempt if one be developed by the evidence, though the present proceeding were dismissed on purely technical grounds. The evidence has been gone into at length and the matter fully argued by counsel for respondents in all its phases. The court will therefore treat the present charge as sufficiently specific and broad to cover any contempt which may be proved, whether civil or criminal, and decide the case on its merits in either or both phases, and determine, according to the conclusion reached, whether it will discharge the present rule on its merits, or further try the matter on a new rule.

Courts will not tolerate defiance or evasions of their commands by artifice or contrivance of any kind. They look behind the form to the substance, and, sitting as trier of the facts as well as the law, in passing upon such contempts, will draw any inference a jury may legitimately draw from the circumstances. Jurisdiction of the person and subject-matter and to make the order being unquestioned, the only issue here is: Did the respondents, or either of them, disobey the commands of the injunction after knowledge or fair notice of its issuance?

Ordinarily, it is true that one who anticipates the bringing of a suit against him may absent himself from the jurisdiction, and continue in hiding after he returns, for the purpose of avoiding service of the usual process to compel his appearance when suit is brought, without offending the dignity of the court or invading the legal rights of the plaintiff. When, however, the intention so to evade service, formed before the suit is brought, is put into execution after suit brought, not only to avoid appearance in the tribunals of justice, but to frustrate any orders which may be issued to establish the proper status of an estate or right, pending a controversy, and to preserve it from invasion by a defendant who purposes to act and does act while in hiding, so that he may thwart any orders which may be issued to that end, whatever they may be, such conduct is both illegal and immoral, and the courts will compel submission to the jurisdiction and process by attachment against the recusant party, or sequestration of his property. It is hardly necessary to add that a party who has proper notice of an injunction is bound by it, though it is never served upon him, and when he claims to have had no knowledge or notice of its existence, and is called to account for acting contrary to its commands, the circumstances under which he avoided service is always a proper subject of inquiry in determining the bona fides of his avowal of want of knowledge or notice.

The acts made the basis of the motion against Rice were performed at Coosada and on his way from there to Montgomery some hours before the injunction issued. The contracts and papers prepared in that interval, and used by his attorney to make the transfer of the stock to

Tillis after the injunction actually issued, were delivered by Rice to his attorney, without any knowledge or notice of the issuance of the injunction, or for that matter of the suit which had not then been brought. When Rice returned to this city, he went to Whiting's house, where he remained all night; his whereabouts being kept from his own family, who lived in the city. Whiting had not then been served with the injunction, and did not return to his home that night. Rice did not visit his place of business or his home that night, for the deputy marshals were watching for him and visited both places to serve him and could not find him. Rice had been advised by his counsel to keep as far as possible out of touch with events and leave everything to his lawyer, and was faithfully conforming to that advice. He was not present when the transfer was made at the bank on the night of the 16th, and was not informed at the time. The only persons in Rice's councils who would be likely to give him information of an injunction, if they acquired it, were Whiting and Ball, and they were agreed on the policy of keeping Rice in complete ignorance. The only other persons from whom he would be likely to obtain information were the officers who endeavored to serve him and could not find him. Although Rice was at Whiting's house, awaiting directions from Ball, and laboring under a great mental strain, which, according to the evidence, absolutely unfitted him for business, and naturally very anxious to know the outcome, neither Ball nor Whiting, according to their testimony, had any communication with him that night. He swears that he had no information of the injunction until the next evening. Under the evidence, Rice cannot possibly be guilty, unless he entered into a conspiracy with Ball and Whiting, in anticipation of the injunction, to keep knowledge of it, if it should come to either, from the others, until the contract with Tillis was performed, and in pursuance of such conspiracy one of them, on being informed of the injunction, kept knowledge of it from the others engaged in the transaction at the bank. That aspect of the question is so bound up with the conduct of Ball and Whiting that it will be considered in connection with their explanations.

It is pressed upon the court: That Ball's conduct, in the light of the dealing with Tillis, and Ball's relations to it and to Rice, and his desire to defeat the prior sale, when tested by the common experience of mankind as to the directions in which the interests and feelings of men usually lead them in such situations, demonstrate very clearly that Ball had notice or knowledge of the injunction, and intended to violate it. That his scheme in substance was to have Rice arm Ball in advance of an anticipated, but not then issued, injunction, with all the necessary papers to consummate the transfer to Tillis, so that if it could not be completed before the injunction actually issued it could be done after its issuance, by Ball's acting under the prior power given him by Rice, without involving Rice in accountability to the court for his conduct. That for the purpose of remaining in ignorance himself, so that he could not be held liable for his own acts, after the injunction actually issued, Ball had Rice to secrete himself on the night of the 16th, and did not communicate with him, with the double pur-

pose of having Rice avoid service and of avoiding information from Rice if he were served, and to protect Rice from the charge of connivance in what Ball did after the injunction was served on Rice's codefendants. That for the same reason, Whiting, who was a confidant of Ball and in close sympathy with Rice, presumably at Ball's suggestion, absented himself from his home where Rice was, and when an injunction was served on Whiting the latter, instead of informing Rice or telling Ball that an injunction had been served, said nothing to Rice and merely informed Ball that "a paper" had been served on him, purposely refraining from a more definite statement of its nature or bearing on the matter both of them had in hand. That Ball, in pursuance of his scheme to avoid all appearance of knowledge of what, under all the circumstances, he was bound to know was an injunction against the transfer of the stock, after he was notified of the service of the paper on Whiting, referred him to another lawyer for advice, with whom Ball had been consulting about the situation, in order to relieve Ball's conduct of the appearance of intentionally and willfully shunning information of the contents of a paper, which, under all the circumstances, he was fully conscious was an order forbidding the transfer to Tillis.

Ball was Rice's trusted representative in the conference which led up to the rupture with complainants about the sale of the stock to them. He was his personal counsel, and also his attorney in fact. He was the attorney of the two light companies. Rice, at Ball's suggestion, had given him full authority to trade with Tillis or to consummate the contract with complainants in his discretion, as circumstances dictated at the time. Ball and Rice had discussed the possibility of an injunction the day before it was issued, and the former had reached the conclusion and announced it, after examination of the question, that the contract with complainants could not be specifically enforced. For two weeks prior to that, Ball had endeavored to drive a bargain with Tillis for Rice, for the sale of the stock, which had already been sold to complainants. Whiting, with whom he was constantly counseling, had informed Tillis a short while before, at Atlantic City, that Rice was open to an offer for the sale of the stock to him. Both Ball and Whiting were apprehensive of the service of some paper or process which would prevent the consummation of the trade with Tillis, and were expecting some sort of litigation over the contract with complainants. Both of them, for some reason, desired to defeat the carrying out of the contract with complainants. Whiting, even after he was served with the injunction, as he says by advice of counsel, continued to co-operate with Ball, as though no injunction had been served on him. These facts and circumstances are pregnant with meaning. Standing alone they warrant and require a finding that respondents had notice or knowledge of the order and willfully violated it.

The guilt or innocence of Ball turns solely upon the just answer to the inquiry whether he had knowledge or fair notice of the injunction when he acted. If he had such knowledge or notice and acted notwithstanding, he is guilty. He could not be heard to say he did not intend

to defy the authority of the court when he transferred the stock in the face of the order, known to him, forbidding it. One is always held to intend the direct, natural, and probable consequences of acts intentionally done. Wrongful acts knowingly or intentionally committed can neither be justified nor excused on the ground of innocent intent. The color of the act determines the complexion of the intent. Agnew v. United States, 165 U. S. 50, 51, 17 Sup. Ct. 235, 41 L. Ed. 624. Here, only one consequence, and that inevitable, could result from Ball's acts. They could not be intentionally performed, if he were informed of the existence of the order, without intending to nullify its commands and trample it under foot. In re Home Discount Co. (D. C.) 147 Fed. 555.

Divorced from the special features of the transaction, heretofore narrated, no one would contend, for a moment, that the bare statement to an attorney, by a person for whom he was not then acting, though such person was an officer of two corporations which the attorney generally represented, that "a paper" had been served on him, gives that attorney any notice that the paper issued in a suit against the client for whom he was then acting, much less that it forbade that client's making any disposition of certain property. The naked statement, standing alone, conveyed no intelligence as to the court from which the paper issued, or of the nature of the suit, or the persons who were made defendants, or that any injunction had issued against anybody. The paper might relate as well to a suit against other of Ball's clients as to a suit against the particular client, Rice. Either supposition would be equally reasonable. The strongest unfavorable deduction which can be drawn from the possession of the information is that it gave a clew, which, if followed up, would have led to knowledge that an injunction had issued against the particular client, Rice, for whom Ball was then acting. The case against Ball, however, cannot be made out by showing only that he might have had knowledge of the injunction. It is essential to his conviction, in a proceeding of this nature, to show beyond fair doubt that he did have knowledge or fair notice. In fixing a civil responsibility, the law generally treats a party as knowing that which on facts known to him he should have known, if inquiry would have developed it, and visits him with the consequences accordingly. But the failure of a person to make inquiry, after receiving information of a collateral fact, whereby he remains in actual ignorance of the main fact, which could have been ascertained by such inquiry, is never made the basis for fastening criminal responsibility upon him, for acts which are not offenses unless done with knowledge of the facts. Actual ignorance, though it result from negligence, or recklessly taking chances, without making inquiry, as to the happening of an event which may or may not occur, and of the happening of which the party then has no knowledge, cannot take the place of knowledge that the event had occurred. It cannot convert actual ignorance into knowledge, or substitute what a man ought to have known for what he did actually know, so as to convict him in a criminal proceeding for acts which have no criminality unless done with actual knowledge. Pettibone Case, 148 U. S. 197, 13 Sup. Ct.

542, 37 L. Ed. 419; In re Lennon, 166 U. S. 554, 17 Sup. Ct. 658, 41 L. Ed. 1110. The question, we repeat, turns at last on the inquiry: Do all the circumstances show that Ball had actual knowledge or notice?

Ball explains on oath: That he was not expecting any injunction against Rice. That he had reached the conclusion that specific performance of the contract with complainants could not be enforced, and therefore would not be attempted, by such a suit, much less that an injunction would be issued in aid of it. That he was convinced from the attitude of complainants they did not intend to perform the contract in good faith, and that their purpose was to insist that Rice was obliged to deliver the stock on June 15th, upon the payment of the agreed price per share, without simultaneous performance of complainants' undertaking to assume or to pay the debts of the companies, and that upon his refusal to assent to that construction of the contract would claim he had breached the contract and they were no longer bound to take the stock, and would thus be left free to hamper Rice by further litigation for breach of the contract. That he was confirmed in this opinion by their not making any examination of the books of the light companies, though they had from the 13th of May to the 15th of June to do so, regarding the outstanding indebtedness, the amount of which entered into the measure of their obligations to Rice. That there had been much litigation, which he had the best of reasons for knowing was directed by complainants against the light companies which he represented, for the purpose of driving them out of business, and efforts also to injure Rice's credit, and thus to force the sale of the stock to complainants on their own terms. That, governed by these considerations, he did not doubt that complainants would immediately bring an action at law against Rice for damages for breach of the contract, and seek by garnishments and other process to tie up his funds, including anything which might be contracted to be paid him by others for the sale of his stock. That such a suit at a time when the light companies were struggling with a large bonded and floating indebtedness, upon which Rice and other directors were indorsers for a large amount, upon paper then being carried in bank, and giving, as such a suit necessarily would, notice that Rice had contracted to sell the stock to the complainants and breached it, would enable complainants to ruin the value of the stock, and would result in disaster to these companies, involving Rice himself personally, and for these reasons he advised Rice as he did and to go away from Montgomery and leave matters to him, as Rice was in a nervous state which unfitted him to properly deal with the situation. That neither Whiting nor the two light companies had any contract with the complainants for the sale of any stock, and, when Whiting told him about the "service of a paper on him," he did not believe it was an injunction against Rice. That being then on his way to meet the representatives of Tillis, in the bank where they were waiting for him in the lower story of the building, to close up the details which he was anxious to complete, to get the money Tillis agreed to pay Rice, and to get it out of danger of garnishment, naturally he did not

stop to inquire further or think about the paper, which, for the reasons stated, he did not suppose had any bearing upon the transfer of the stock, and that he had no notice or knowledge of any injunction against Rice until next day.

The contending parties had long been engaged in lawsuits, two of which were brought in this court, and were and had been engaged in crimination and recrimination, and each distrusted the other. The designs Rice and his attorney imputed to complainants we have seen above. The complainants, who insist on their good faith, on the other hand, charge they had been deceived by Rice and his attorney, who, instead of being then engaged in getting matters in shape to carry out the contract, as his attorney stated to them, were then engaged in making a contract with Tillis, and made the false representations to gain time to consummate the trade with Tillis. That shortly after the making of the contract with complainants, Rice, then being president and executive head of the two corporations, caused a large amount of their available or quick assets to be collected or to be reduced to money, at a great sacrifice to them, and used the amount in paying off debts, so that Rice could claim a personal benefit by reducing the amount of the debt under a clause of the contract which bound the complainants to pay him the difference, if the debts amounted to less than $75,000.

It would not be proper on this hearing to express any opinion as to the truth of the issues thus raised between the contending parties. These things are alluded to here merely because the situation thus depicted throws light upon the mental status of the respondents, and aid in testing the reasonableness of their version of matters, and the sincerity of Ball's statement that he did not think the paper of the service of which Whiting informed him, was an injunction against Rice. The action of respondents in trying to make a bargain with Tillis for this same stock for two weeks before complainants disclosed any attitude as to the performance of the contract with Rice is inconsistent with the version that the sale to Tillis was forced by the acts of complainants, regarding the performance of the contract, on June 15th. Nor is it easy, on the other hand, to understand why, if there was not an earnest belief on the part of the respondents that the complainants did not intend to carry out the contract, and would sue them at law, they would make a contract with Tillis, which, on its face, at least, is considerably less to Rice's advantage than the contract with complainants.

It is not consistent with the evidence to find there was "a conspiracy of silence," to which Rice was a party. He left everything blindly to Ball, and it was quite unnecessary for Ball and Whiting to have had any understanding with Rice about his action in event an injunction was served on him. He was thought by them to be unfitted for business when he left the city, for which reason they aver they got him to leave, and then was the only opportunity they had to form such conspiracy. When he left no injunction had issued. The utmost that can be said of his conduct is that he entered into a conspiracy to evade service. If there had been any conspiracy between Ball and Whiting

about what the latter should say if an injunction were served on him, it must have been formed before the injunction was issued, for the evidence does not show they had any opportunity afterwards. If Whiting and Ball conspired about that matter, it seems most improbable that Whiting would have mentioned the paper at all. He would rather have maintained absolute silence as to it until Ball finished the transaction at the bank. A lawyer devising a conspiracy, as to that, would hardly have formed the design to have Whiting mention "the paper," and thereby give a clew to the existence of the injunction, information of which is the strongest circumstance here to show that Ball had knowledge of the injunction before the transfer of the stock. Moreover, both Ball and Whiting swear that what passed between them at the time Whiting mentioned the paper, whether it was at the time of the negotiations with the bank, as Whiting swears, or afterwards, as Ball states, was all that passed between them about the paper, until long after the transfer of the stock. It seems quite unnatural that respondents did not read the newspapers, the morning after the transaction, or that no member of their households mentioned the injunction, though both the morning and evening dailies printed conspicuous headlines and columns of matter concerning the injunction, and were shown to have been delivered at their residences. Whether or not information was thus derived is not material now, since these newspapers appeared after the transfer was made, save as it bears upon the credibility of the witnesses. Rice had been told to evade information, and Ball, who still had some details to attend to, and had been up late the night before, states that he hurried to his office, and did not read the newspapers until late that evening.

After much study of the facts and careful consideration of the elaborate oral and written arguments of counsel concerning this transaction, in which the main defendant, by evading service after two of his codefendants were served, managed, through his attorney who was not served, to effect the transfer of the stock in spite of the solemn order of this court, and with firm purpose to hold them to strict account if the facts permitted, the court cannot reach the conclusion that Ball's conduct, in view of his explanations, demonstrates that he violated a solemn order of the court with the consciousness that it had been made or with fair notice of its terms. This proceeding is highly punitive and criminal in its nature, and respondents are entitled to the benefit of the reasonable doubt. The criminal intent here turns upon the scienter, and there is denial on oath of knowledge or notice. Courts, while not treating such denials as conclusive, will generally give them sufficient weight to turn the scale, if the circumstances admit of fair doubt as to the existence of knowledge. Wilson v. North Carolina, 169 U. S. 600, 18 Sup. Ct. 435, 42 L. Ed. 865.

That case attracted wide attention for a long time in that state. The Governor removed Wilson from the office of railroad commissioner and appointed Caldwell in his stead. Wilson refused to deliver possession, and thereupon a quo warranto, on the relation of Caldwell, who had been appointed his successor, was brought against Wilson in the state court. The lower court having decided against him, Wilson appealed to the Supreme Court, which ruled the same way, and entered a judg-

ment of ouster against him. A few minutes after 7 o'clock on the evening of the entry of that order, Wilson was allowed a writ of error and supersedeas. Nevertheless Caldwell after this caused the sheriff to execute the writ of ouster and took possession of the office.

It seems quite as unnatural in that case as in this that there was no information of what proceedings had been taken in the case. The legal propositions asserted all throughout that case gave warning that Wilson would carry it to the Supreme Court of the United States, and procure a supersedeas as speedily as possible. Whatever steps he might take to that end would necessarily be taken in the state Supreme Court sitting at Raleigh, where Caldwell then was. Wilson brought Caldwell's conduct to the attention of the Supreme Court of the United States, averring that Caldwell, with "full knowledge of the writ of error and supersedeas, took possession of the office in disregard of the supersedeas," and thereupon moved to attach him for contempt. The Supreme Court discharged the rule, saying:

"Caldwell swears unequivocally that he was ignorant of the allowance of the writ or the filing of the supersedeas bond at the time he took possession of the room occupied by the commissioner, and that he was not informed of it until some time next day. We think this a sufficient answer. We see no evidence of intentional contempt on the part of the relator."

In an Ohio case, the court in an election contest made an order to preserve the ballots, which otherwise, under the statute, were to be destroyed after a certain time. The order was in writing, handed to the clerk, and marked filed by him. He afterwards destroyed the ballots. Being arraigned for contempt, he set up that in the rush of business he did not read the order, and did not know its contents. The lower court fined him for contempt, but the appellate court reversed the judgment. As it was not certain under the evidence that the clerk had knowledge of the order, and therefore had acted willfully, it gave him the benefit of the doubt, when he denied knowledge on oath. See, also, Slater v. Merritt, 75 N. Y. 268.

According to all the authorities, if a contempt consists of acts done or statements which are ambiguous in character, and which are capable of two constructions, one of which would amount to a contempt, and the other not, so that the intent of the party himself becomes the material question of inquiry, then a denial on oath by such a party of information of an ignored order and of any intent to show disrespect to the court is entitled to much weight. See authorities collated in note to O'Flinn v. Mississippi, 9 L. R. A. (N. S.) 1119. All that can be said after weighing all the facts and circumstances of this transaction is that Ball might have known of the order, and intended to defy it, or he might not have known of the order, and had no intention to disregard it. No one can be punished for a criminal contempt unless the evidence makes it clear that he intended to commit it. To doubt is to be resolved in favor of respondent.

The acts of the defendants, though accomplished by what, under the circumstances, the court holds is not a criminal contempt, have nevertheless nullified the order of the court and changed the status of the parties as fixed by the terms of the restraining order. The stock, the subject-matter of the litigation, has passed out of Rice into the

hands of a stranger. It happened under circumstances which made this inquiry imperative. The necessity for it was occasioned solely by the acts of the respondents, done in repudiation of the rights of the complainants, as fixed by the order. It would be inequitable and unjust to tax complainants with the costs of the proceeding. The costs should be borne by the respondents, and upon their seasonable payment an order will be entered that the rule be discharged as to each of the respondents.