## In re LA VARRE.

District Court, S. D. Georgia, Augusta Division.
June 28, 1930.

Chas. L. Redding, U. S. Atty., of Savannah, Ga., for the prosecution.

Perrin & Tinsley, of Spartanburg, S. C., and W. O. Cooper, Jr., of Macon, Ga., for respondent.

BARRETT, District Judge.

Hall brought suit against La Varre in the superior court of Richmond county, Ga., averring in substance that plaintiff and defendant as partners had borrowed from the International Paper Company some $900,000 which had been used to purchase the stock of the Augusta Chronicle, Augusta, Ga., the Record Publishing Company, Columbia, S. C., and the Spartanburg Herald-Journal Company, Spartanburg, S. C.; that, by the agreement with the lender, the stock so purchased was to be pledged as collateral security for the obligation of such partners to the paper company; that La Varre denied the partnership and claimed that he was the sole owner and that Hall was his employee. This case was at the instance of La Varre removed to this court, and, after a protracted hearing, there resulted a final decree on September 30, 1929, establishing that the partnership did exist, and containing the following paragraph:

"That said William La Varre and Harold Hall be enjoined and restrained from in anywise interfering with the assets of said joint estate or with the administration of the same under the orders of this Court, or with the Commissioner herein and hereby appointed, by legal action or otherwise, in carrying out the terms of this decree; and that the said Harold Hall and William La Varre be and they are hereby each enjoined from proceeding in any way, as individuals or officers of either of said corporations or as directors or stockholders of said corporations, to change the status of said corporations, and from proceeding in any Court for the administration of the assets of said corporation, no such application to be made unless and until authorized by the vote of the stock of said corporation transferred to and held by said Commissioner."

J. T. Webb, Jr., was appointed by the court as commissioner, and was ordered to have issued to him as such commissioner the stock in the aforesaid corporations, "but with no right in said Commissioner to vote said stock at any meeting of the stockholders of either or all of said corporations unless and until hereafter authorized or directed by the Court upon application for leave so to do."

On December 16, 1929, Judge Deaver filed an opinion which he felt impelled to do because of certain facts in connection with an application for supersedeas as to the final decree and as to an amendment thereto passed October 29, 1929. Reference will be made hereafter to certain portions of such opinion.

There was delay on the part of La Varre in transferring the stock in the two South Carolina corporations, but finally he present-

ed certificates transferred, with a notation thereon to the effect that it was done in deference to the aforesaid final decree and subject to the right of appeal. The court declined to accept such transfer with the notation on the certificates as a compliance with its order. On the 2d of January, 1930, La Varre transferred the certificates to the commissioner without any notation thereon. On the same day, however, he wrote a letter to each of the South Carolina corporations containing in substance the same conditions which had been attached to the stock certificates.

On January 6, 1930, Judge Deaver passed an order authorizing the commissioner to vote the stock in such corporations.

La Varre through his counsel filed lengthy objections to the passage of such order, such objections, briefly stated, being that the hearing was not called for such purpose; that no petition or any pleading of any kind had been previously served upon La Varre; that the purpose of the hearing had been stated to be to determine as to the payment of certain debts and to hold "an informal discussion of the Commissioners' report"; that the two South Carolina commissioners appointed to investigate and report upon the possibility of profitably operating the papers had not been heard; that such order was contrary to certain statements in the opinion of Judge Deaver of December 16, 1929, such as "Under these decrees the defendant was purposely left in position to devote his talents to the upbuilding and successful operation of the papers," and that no change would be made in the plan of letting the defendant continue his efforts to run the papers until after full discussion, and "if * * * it appeared that the corporations under defendant's management were headed for bankruptcy" a change might be made and there is not a scintilla of evidence that they were so "headed", and that La Varre's consideration of the advisability of applying to the Circuit Court of Appeals for a supersedeas of certain portions of the decrees of September 30, 1929, and October 29, 1929, "was abandoned because your petitioner's (La Varre's) counsel were of the opinion that your Honor's opinion was a definite chart and express opinion of the future course of the case."

Subsequent to January 6, 1930, La Varre petitioned the Circuit Court of Appeals of the Fifth Circuit to supersede that portion of the order of January 6, 1930, authorizing the commissioner to vote the stock of said corporations. Among other allegations in said petition for supersedeas were the following:

That La Varre would be removed from the presidency of the two South Carolina corporations; that the reason the Columbia and Spartanburg papers did not through a named period show a profit was because petitioner was engaged upon "a development program in connection with the said papers and was not at that time making any effort to show a profit"; that the "present board of directors of the Columbia and Spartanburg papers, who were elected by the stockholders of the respective corporations at a time when there was no litigation, and who have shown that they are capable of successfully managing the properties under their direction, be left in control of the corporations and that the control be not snatched from them and placed in the hands of a commissioner"; that "no other act is necessary on the part of the Georgia Court to place the Commissioner in position to sever appellant's connections with his papers" (this quotation in black type); and that such order of January 6, 1930, was contrary to certain portions of the opinion of Judge Deaver, quoted in the petition.

By petitions filed with the court by the commissioner, it appeared that the commissioner, pursuant to the authority of the order of January 6, 1930, held a meeting of the stockholders of the Record Publishing Company and elected directors and adopted bylaws, and the directors elected officers who undertook to take charge of the newspaper, the Columbia Record, when they were ejected by force by La Varre, who claimed to be acting as president of the Piedmont Press Association, which, according to his claim, was the lessee of the said newspaper; and that a like effort was made on the part of La Varre as to the two Spartanburg papers, the Herald and Journal, but any interference by La Varre was prevented there by the issuance of a criminal trespass warrant against him; that thereafter the Piedmont Press Association, at the instance of La Varre, brought its petition in the Supreme Court of South Carolina, exercising original jurisdiction, undertaking to enjoin the commissioner of this court and the officers elected by virtue of the authority granted such commissioners to vote the stock from interfering with the Columbia Record, which it was claimed was under lease to the said petitioner, and the further fact was brought to the attention of the court of the filing with the Record Publishing Company and the Spartanburg Herald-Journal Company of the letters of January 2, 1930, concurrently with the transfer of the certificates of stock by La Varre unconditionally, which is above referred to.

This resulted in an order passed by Judge Deaver on February 24, 1930, as follows:

"It is Considered, Ordered and Adjudged:

"(a) That this court has jurisdiction over the body of the said La Varre;

"(b) That the petition of said Webb, filed on the ——— day of February, 1930, and duly verified by him, be treated as information advising this court of a probable wilfull criminal violation of the decrees and orders of this court, and that said petition be made a part of this order for the purpose of advising the said La Varre of the charges against him, in detail;

"(c) Probable cause exists to believe the said William La Varre has violated the third paragraph of the decree of the court dated September 30, 1929, and has challenged the power, dignity and authority of this court, and that probable cause exists to believe the said William La Varre to be guilty of the offense of criminal contempt of this court;

"(d) That this cause be transferred to the criminal side of the court and entitled: 'In re William La Varre';

"(e) That writ of attachment issue under the seal of this court, requiring the marshal to attach the body of said William La Varre and have him before me at the United States court house at Augusta, Georgia, at 10 o'clock A. M., on the 28th day of February, 1930, and from day to day thereafter then and there to answer this court touching the contempt which he is alleged to have committed against it, and such other matters as shall then be laid to his charge, and further to abide such charge as the court shall make in this behalf;

"(f) It is further ordered that, in the event the return of the Marshal for the Southern District of Georgia shows that the said La Varre can not be apprehended in the Southern District of Georgia, then the said J. T. Webb, Jr., as representative of this court, is authorized and directed to take such steps and initiate such proceedings in any district in the United States in which the said La Varre may be found, to attach his body and have him before me at the time and place herein provided."

It is deemed unnecessary to set forth the order of February 6, 1930, based upon the first report of the commissioner because of the fact that such first report, together with the order thereon, is embodied in the second report.

The return of La Varre to the aforesaid order was substantially to the effect that his objecting to the exercise of possession and control by J. T. Webb, Jr., who had been elected as president of the two South Carolina corporations, acting under the authority of the order of January 6, 1930, was not in contempt of this court, but was a sincere exercise of the rights of the Piedmont Press Association, of which La Varre was president, and which association held a valid lease from said newspapers dated June 22 and 24, 1929, respectively; that this court had no jurisdiction over him in the premises; that he was advised by competent counsel as to his rights and duties in the premises both in objecting to the possession and control by the said Webb and in the matter of bringing his petition for injunction to the Supreme Court of the state of South Carolina; that the letters of January 2, 1930, written to the said two corporations as to the transfer of the certificates of stock were both in accordance with the opinion of Judge Deaver and were written prior to the order of January 6, 1930, which for the first time authorized the voting of such stock by the commissioner; and "that at no time and in none of his actions was this respondent conscious of intentionally or otherwise violating any of the provisions of the orders of this court and was simply performing such acts as he conceived it to be his duty to perform as president of the Piedmont Press Association in accordance with the legal advice given him as to his duties as such; and that at no time did any act in wilfull disobedience to the orders of this court."

Thereafter there was resistance to extradition on the part of La Varre both in South Carolina and in New York, resulting in vigorous litigation. If La Varre were not in contempt, such resistance was logical and justified. If he were in contempt, the offense was completed before these resisting efforts were made.

The main case of Hall v. La Varre has been conducted exclusively by Hon. Bascom S. Deaver, designated judge for this district. The trial of this criminal contempt proceeding falls to William H. Barrett, Judge of the Southern District.

Counsel for the prosecution urges that the aforesaid order, with the accompanying petition to which reference in the order is made, presents four charges of criminal contempt against La Varre, as follows:

(1) Interference with Webb, who was acting under the order of this court of January 6, 1930, authorizing him to vote the stock in the South Carolina corporations.

(2) Interfering with the assets of the estate, or with the administration of the same, in violation of paragraph 3 of the final decree above quoted, and other provisions of the decree to a like effect.

(3) The institution by La Varre of the suit in the name of the Piedmont Press Association in the Supreme Court of South Carolina.

(4) The sending of the letters of January 2, 1930, to the two South Carolina corporations concurrently with the apparent unconditional transfer of the certificates of stock by La Varre to Webb.

While the foregoing order for attachment of February 24, 1930, refers to the petition upon which it is based, making it a part of this order "for the purpose of advising the said La Varre of the charges against him, in detail," yet in the next paragraph of such order is the only definite charge against him, namely, the violation of "the third paragraph of the decree of the court dated September 30, 1929."

Inasmuch as it is the opinion of this court that in essential elements the several acts of contempt all involve violation of the aforesaid decree of September 30, 1929, this case will be considered from that viewpoint alone.

The first three charges, as analyzed above, depend upon the good faith of La Varre in connection with the Piedmont Press Association as hereinafter discussed, while the fourth feature of the charge is distinct from that, and will be first discussed.

2. The letters from La Varre to the newspaper corporations dated January 2, 1930, are as follows:

"In view of a letter which you have shown me from Irvine F. Belser, Attorney at Law, and in view of statements made in open court, and in writing by judge Bascom S. Deaver, Macon Georgia, that the court desired only to hold certain certificates of stock in the Spartanburg Herald-Journal Company, pending the outcome of the case by Court of Appeals Decision, I hereby authorize you to reissue the stock which is on the books of the company in my name to J. T. Webb Jr As Commissioner, specifically reserving unto myself all voting rights therein, the said commissioner only to hold the equity rights of the certificates pending the final decision of the Court of Appeals.

"It is to be specifically understood, and a requirement of this transfer that the said new certificates do not carry with them any voting rights to the said J. T. Webb as Commissioner, all voting rights of such shares of capital stock to remain in my name pending the final decision of the Circuit Court of Appeals.

"This is the understanding under which, without value received, I authorize said new certificates to be made and issued."

We are not advised as to the contents of the letter from Attorney Belser. It is true that this court had up to that date specifically provided that the voting power of the stock did not pass to the commissioner. But this court had notified La Varre that the transfer of the stock certificates with a notation thereon of like import to such letters was not a compliance with the order, and then La Varre had transferred the stock without such notation. These letters, written concurrently with the professed compliance with the order of this court and which were apparently kept secret from this court, could have had no other purpose than to impair, if not destroy, the effectiveness of the apparently absolute and unconditional transfer. All must agree that such conduct was not ingenuous. My conviction is that not only did it smack of sharp practice, but was in violation of paragraph 3 of the decree of September 30, 1929.

3. The real issue to be determined as to the other divisions of the charge is, Was the claim of La Varre, in taking the action that he did as president of the Piedmont Press Association, in good faith, or was the utilization of this association, together with the alleged leases, a mere device or subterfuge as a part of his defiance and disobedience of the orders of this court?

There is no difference of opinion as to the nature of this proceeding and the law applicable thereto. Proceedings for criminal contempt are "to preserve the power and vindicate the dignity of the courts, and to punish for disobedience of their orders." Footnote, title 28, § 385, USCA. Counsel for defendant advise that they rely upon the case of Gompers v. Buck's Stove & Range Co., 221 U. S. 418, 31 S. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874. That is the law.

The evidence submitted is ample to establish beyond a reasonable doubt that the defendant, La Varre, is guilty of criminal contempt in violating section 3 of the decree of the court of September 30, 1929, unless his claim made subsequent to such decree and subsequent to the decree of January 6, 1930, that all the property of the South Carolina newspapers were under a legal formal binding lease to the Piedmont Press Association,

220

and that all of the activities of La Varre were genuinely and sincerely for the purpose of maintaining the rights of the said lessee corporation and his oath that it was not his intention, as declared both in his return to the court and his oral testimony, to violate any order of this court, are well founded.

It is not open to question that from the beginning of the borrowing of the money from the paper company in 1928 and the purchase of the stock of the newspaper corporation a holding company was to be organized, principally for the purpose of financing the whole affair in such a way as to enable the repayment of the money borrowed from the paper company. This did not mean, however, that such holding company was to be a lessee which was to have all the real substance of this transaction and leave the corporations owning the newspapers as mere shells. Let us examine the facts. The Piedmont Press Association was chartered under the laws of South Carolina May 23, 1929. The capital stock of 1,000 non-par value shares was all acquired by La Varre. So far as disclosed by the financial statement furnished, only $500 was paid for these shares. La Varre testified that he paid $1,000 for them. The company had no other assets, unless it be that the value of the leases from the two paper companies was an asset. The financial statement of such company discloses that it had no financial transactions between the 23d of May, when it received the $500, and August 20th, when it is alleged to have received from the Columbia Record $2,135. The only items of receipt, as shown by its financial statement, up to September 30, 1929, were loans from La Varre of $15,360, which money it is claimed by the prosecution was part of the partnership assets, and collections from the newspaper corporations aggregating $6,331.-58. The minutes of the association do not disclose any action for some months after its organization, and there was no corporate action authorizing such leases. La Varre continued to have the ownership of all of such capital stock except a few qualifying shares and a few shares distributed by him.

The minutes of the Record Publishing Company of June 22, 1929, authorize the execution of a contract with the Piedmont Press Association. At that time La Varre owned 950 of the 1,000 shares of the capital stock of such publishing company, and the whole record discloses that it was La Varre's action. On the 24th of June, 1929, the Spartanburg Herald-Journal Company, acting through its board of directors, authorized the execution of the lease to the Piedmont Press Association. At that time 994 shares of the capital stock of such company stood in the name of La Varre and the other 6 shares were under his control.

It must be remembered that this action of La Varre was attacked by Hall as a part of his scheme to defraud Hall, and that it was charged that a similar action was proposed as to the Augusta Chronicle, which action was restrained by the superior court of Richmond county, Ga. The issue here is not as to the legality of this as between Hall and La Varre, but it is as to the good faith of La Varre as against the orders of this court. If La Varre entertained the conviction that this lease was genuine and that the lessee was actually lawfully, as a separate entity that should be protected, in charge of the two newspapers and in control of their operation, with full right as disclosed by the terms of the lease to continue such control and operation for fifty years, with the right to receive the entire earnings of the newspapers conditioned only upon the lessee company carrying out its contract, why should he have been utterly silent during the time when the court, according to his own assertions, was passing orders which would affect the control and operation of the newspapers in South Carolina? Why was he concerned materially at all as to whether, in the first place, the stock was transferred to the commissioner and, in the second place, as to whether the voting power was given to the commissioner, when such transfer and such voting power could not deprive the lessee company, which was undoubtedly La Varre in substance, of the operation and control of the papers? Is it conceivable that he could have entertained such belief on January 6, 1930, when he filed his seven objections to the passing of such order giving the voting power to the commissioner? If at that time he honestly believed that the lessee company was in control of the operation of these papers, what more natural,—if he was dealing at all fairly with the court and really believed that the legal relationship which he afterwards asserted did at that time exist, namely, that there was a genuine lease from the owners of the papers to the Piedmont Press Association,— than that he should have advised the court of the fact? He must have known, as indicated both by his declarations and by his silence, that certain it was that this court, acting through Judge Deaver, believed and had every reason to believe that the passing of the orders, especially that of January 6, 1930, would result in taking from La Varre the operation and control of the newspapers and

vesting the same in his commissioner or in whomever his commissioner should elect. What other belief than this could La Varre have had when he stated with emphasis in his petition for supersedeas "no other act is necessary on the part of the Georgia court to place the commissioner in position to sever appellant's connections with his newspapers"?

The masthead of a paper is supposed certainly to speak the truth. As late as October 5, 1929 (and it may be later), the masthead of the Spartanburg Herald discloses the following: "Charles O. Hearon, Editor. William La Varre, Publisher. Published every morning by Spartanburg Herald-Journal Company." The masthead of the Spartanburg Journal of December 6, 1929, discloses the following: "Charles O. Hearon, Editor. William La Varre, Publisher. Published daily except Sunday at 177 West Main Street, Spartanburg, S. C. by Spartanburg Herald-Journal Company (incorporated) * * * Member of Associated Press." On the 7th of December, 1929, the masthead was different in these particulars: Instead of declaring that it was published "by" the Spartanburg Herald-Journal Company, it is published "at the offices of" such company, and contained this additional feature: "Member the Piedmont Press Association." The masthead of the Columbia Record of December 2, 1929, was as follows: "Fitz Hugh McMaster, Editor. William La Varre, Publisher. Published afternoons and Sunday morning by The Record Publishing Company * * * Member of the Associated Press." On December 3, 1929, this masthead was changed so as to disclose, instead of being published "by The Record Publishing Company," it read "at the offices of" such company, and with this added feature, "Member of the Piedmont Press Association." There is no disclosure as to why there was the change in the mastheads from declaring that these papers were published "by" the corporations to "at the offices of" such corporations. As to that we are left entirely to surmise. The added statement that the two papers are "Member The Piedmont Press Association" is most significant. It discloses that at that time it was no mere lapse of memory as to the existence of the association. If the association was in truth the publisher, it is difficult to conceive why the statement should not be made, and still more inconceivable as to why the statement should be made that the newspaper was "member" of such association in the same language that the statement is that it was a member of the associated press.

Be it remembered that the injunction forbade La Varre from interfering "with the commissioner herein and hereby appointed, by legal action or otherwise, in carrying out the terms of this decree." Even though Judge Deaver erred in supplementing the power originally granted his commissioner with the authority to vote the stock, that change was one of the possibilities in contemplation as evidenced by the provision in the final decree of September 30, 1929, that the commissioner could not vote the stock "unless and until hereafter authorized or directed by the court." It is true that there was added, "upon application for leave so to do," but nevertheless there was this notice of the possibility of a change in the authority; and such a possibility would exist even though there had not been this implication thereof. The fact, if such be a fact, that the order of January 6, 1930, was erroneous, either by lack of power or by a wrongful exercise of discretion, does not alter the fact that it stood and stands as an order of a court of competent jurisdiction, and, if it can be defied and set at naught, then any order of any court can be defied and set at naught. Appeal was possible. Supersedeas, if proper, was possible. But defiance cannot be tolerated by a court that would maintain, as is its duty, its power and dignity.

As was well said by Judge Thomas G. Jones of the Circuit Court of Alabama, in the case of In re Rice, 181 F. 217, 221: "Courts will not tolerate defiance or evasions of their commands by artifice or contrivance of any kind. They look behind the form to the substance, and, sitting as trier of the facts as well as the law, in passing upon such contempts, will draw any inference a jury may legitimately draw from the circumstances."

With full knowledge that this is a criminal case and of the degree of proof required, and an entire recognition of the entirely sound proposition that neither laymen nor lawyers should be held criminally responsible for honest errors in interpreting the validity or meaning of contracts, this court reaches the conclusion that the acts of William La Varre in the name of the Piedmont Press Association, or as its executive head, in ejecting Webb and the other officers elected with him from the office of the Record Publishing Company, in attempting to do likewise in the case of the Spartanburg Herald-Journal Compa-

ny, and in seeking an injunction from the Supreme Court of the state of South Carolina were all consciously in violation of the order of this court, and that the attempt to hide behind the organization, charter, name, or lease contract, or all, of the Piedmont Press Association, was not in good faith and was in defiance of these orders and therefore criminal contempt.

4. Citation of authority is unnecessary to establish the legal proposition that advice of counsel does not relieve of responsibility for criminal contempt. It may and properly does mitigate the punishment. The rule is wise for a number of reasons. No other need be cited than the possibility always that counsel is not fully acquainted with all the facts. Then, too, there is always the possibility that counsel may be willing to co-operate in defying the order of a court which is contrary to his advice and contention. We need not discuss this element here. The law is fixed.

5. The defendant in this case has both in writing and orally sworn that he did not mean to be guilty of contempt. There have been times when such oath was conclusive in his favor, but the law is and has been for many years different in the United States courts.

6. It is recognized that the power to punish for contempt of court should be used sparingly and with great caution and deliberation. In this case there have resulted from the criminal contempts large losses in the way of expensive litigation, traveling, and the like. Were the defendant in position to satisfy such losses, it would seem that the appropriate punishment would be to require him "to make restitution or reparation to the aggrieved party or parties for actual damages or loss caused by the offense for which conviction was had," as provided by the act commonly known as The National Probation Act, title 18, section 724, USCA, which would be quite sufficient. Under his oath we are advised by him that his financial resources are less than zero. Therefore such a sentence would be futile as indemnity and, if his confinement were to be continued until payment, it would be too severe. It is recognized that he has already suffered, both in the way of expenses (though it is claimed that most of the money expended by him really belonged to the funds at issue) and by confinement in the jail of Richmond county, Ga., for thirty days, and the sentence will be imposed with full consideration of these elements.