### UNITED STATES ex rel. PORTER v. KROGER GROCERY & BAKING CO.

### No. 9172.

Circuit Court of Appeals, Seventh Circuit.

Aug. 15, 1947.

Charles Aaron, Franklin Raber and Sidney J. Hess, Jr., all of Chicago, Ill., for appellant.

Otto Kerner, Jr., U. S. Atty., and William J. Corrigan, both of Chicago, Ill., William E. Remy, Deputy Com'r for Enforcement, David London, Director, Litigation Division, and Albert M. Dreyer, Chief, Appellate Branch, all of Washington, D. C. (Isadore L. Kovitz Regional Enforcement Executive, and Abraham Miller, Litigation Atty., both of Chicago, Ill., of counsel), for appellee.

Before SPARKS, MAJOR and MINTON, Circuit Judges.

MAJOR, Circuit Judge.

This is an appeal from a judgement finding the defendant guilty of a criminal contempt of court. A fine was imposed in the sum of $48,000, to be paid to the United States, and the costs of the proceeding assessed against the defendant. The action was instituted on May 1, 1946, by the plaintiff's request for prosecution, alleging that the defendant violated the provisions of an Injunction Order of the United States District Court entered on September 24, 1945, restraining the defendant, its officers, agents, servants, employees and representatives from selling or offering to sell at its retail stores in the Chicago metropolitan area, meats, groceries, fresh fruits, poultry and vegetables at prices in excess of the maximum prices established by the regulations of the Office of Price Administration. In response to an order to show cause, the defendant on May 23, 1946, filed its answer. Both the request and the answer were supported by numerous affidavits. The court refused to try and decide the case on the affidavits submitted and a long trial ensued, during which many witnesses were heard.

The defendant operates approximately 3,000 stores in 18 different states, which are divided into 25 branches. The Chicago branch embraces the Chicago metropolitan area and includes 183 stores, 122 of which have meat markets, at which meats, groceries, fresh fruits, poultry and vegetables are sold to the consumer at retail. The executive offices of the defendant are located at Cincinnati, Ohio. The grocery department carries 2,000 items, not including meat. In normal times defendant's stores selling meat in Chicago carry 250 to 300 meat items in addition to grocery items. It operates its Chicago branch through an organization consisting of a branch manager, a grocery merchandiser, a produce merchandiser, a meat merchandiser, and their assistants, a general district manager, and 11 district

managers. Each store has a manager, each meat market a head meat cutter and numerous other employees such as journeymen meat cutters, clerks, checkers and cashiers. In the 183 stores in the Chicago branch defendant employs approximately 825 full-time employees in the grocery and produce departments, 275 full-time employees in the meat departments, and 300 part-time employees in the grocery and meat departments, all of whom are directly connected with the distribution of merchandise to the public.

The merchandisers under the supervision of the branch manager buy all the merchandise handled in the various stores of the Chicago branch and determine and fix the selling prices of all merchandise sold. The various district managers under the supervision of the general district manager supervise the operations in the various stores and meat markets in their respective districts and are charged with the responsibilty of carrying out defendant's rules, regulations and policies.

. The request for prosecution alleged 191 purchases at 31 of the defendant's retail stores during the period from November 28, 1945, to April 16, 1946, at over ceiling prices. These alleged purchases were itemized, giving the date, the item purchased, the price charged and the maximum ceiling price. All the purchases relied upon are meat items, and grocery items carried by the defendant are not involved. The overcharges of these various purchases vary from a minimum of 1¢ to a maximum of 15¢ per pound. All of the alleged purchases were supported by the affidavits of the persons making the purchase, in the main OPA investigators although a few of such purcases were supported by the affidavits of housewives. At the trial, the government produced the same witnesses who had made affidavits and their oral testimony in all material respects is the same as that contained in their affidavits.

The defendant's answer to the rule to show cause is voluminous and sets forth in detail the magnitude of its business, its system of conducting the same, and the responsibilities and duties which are imposed upon its numerous officials and employees. The answer does not deny that the purchases were made as alleged in plaintiff's request. It rather assumes that they were made but asserts that they were attributable to unavoidable conditions encountered in the sale of meat and meat products or to unintentional errors, mostly by the meat salesmen but in some instances by the employee or official who was charged with the responsibility of determining and furnishing to the various stores the maximum ceiling prices for the various items. The answer sets forth at considerable length factors which might account for numerous of the alleged overcharges.

The answer alleges that neither the meat cutters nor store clerks nor any other representative of defendant had any knowledge or recollection of the purchases set forth in the request for prosecution; that the meat cutters and store clerks never knowingly made a sale at a price in excess of the maximum ceiling price; that the selling prices were fixed by the merchandisers under the direction of the branch manager and were furnished to the meat cutters and store clerks with orders and directions to observe such prices at all times; that meat cutters, store managers or clerks had no authority or power to determine or fix the price of any commodity sold; that the meat cutters and all other store employees were repeatedly warned, admonished and directed by the management not to sell any article at a price in excess of the maximum price of the Administrator; that the merchandisers, district managers, store managers, meat cutters and other clerks in the stores were advised of the issuance of the injunction and the meaning and effect thereof and that it applied to them; that they were advised of the punishment to which they would be subjected for any violation; that the declared and announced policy of the executive officers of defendant was to cooperate with the Price Administrator in maintaining price control; that orders and directions were given to the branch managers, including the manager of the Chicago branch, to adhere to, observe and follow the price regulations issued by the Administrator; that after the issuance of the injunction the management was constantly warning the meat cutters, store managers and clerks by printed bulletins and orally

through the district managers of the necessity and importance of strict compliance with the company's selling price lists, and that the errors made by the grocery merchandiser or meat merchandiser whose duty it was to fix defendant's selling prices in the Chicago branch were accidental and unintentional, and at the time they fixed the selling prices on certain of the items contained in the government's request they did not know that those prices were in excess of the maximum prices fixed by the Administrator for such items.

The answer also alleged that on or about the date of the injunction the defendant employed a shopping service (Merit Protective Service of Illinois) to check the prices charged at the various stores as well at the competency and integrity of its employees, to determine whether they were complying with the OPA rules, regulations and directives, and with defendant's price list distributed to its stores. The answer set forth in detail the result of this survey, which disclosed that from November 1, 1945 to April 30, 1946 (substantially the same time covered by the government's witnesses), 240 stores were shopped in the Chicago area and that the aggregate number of items of merchandise purchased was 4,448. Upon the purchase of such items they were taken to the office of the district manager and each item analyzed for the purpose of determining if they had been sold above the ceiling price, and the district manager was instructed to and did return such items to the various store managers or head meat cutters, and to discuss with them the reason for the price charged. In analyzing the purchases thus made it was found that 829 items were ostensibly in excess of defendant's selling price but that only 448 items constituted actual overcharges and that 352 items were sold at prices below defendant's selling price. This survey showed that the aggregate amount of charges ostensibly in excess of defendant's selling price was $24.69, and the aggregate amount of charges less than the company's selling price was $9.13. (It will be noted that the result which the defendant obtained from this shopping service was strikingly similar to that obtained by the government's secret agents, as detailed in its request for prosecution.)

In making an analysis of the items purchased in this survey all doubts, so the answer alleges, were resolved against the retail store as it was the desire of the branch manager to emphatically impress on each store employee the importance of compliance. It was determined that many of the ostensible overcharges were due to what is known in the trade as "shrink" and "skin and trim" of meat products, and to "marginal error" in weighing items sold by weight. The items where overcharges had been made were returned to the store manager or head meat cutter and in the presence of the employee who had actually made the sale, if his identity could be determined, the error was demonstrated and an explanation required as to why it was made. The employees were warned that a repetition of the offense would result in their discharge. District managers reported to the general district manager the result of these interviews, including the explanations obtained as to the overcharges. After a careful analysis of such reports, it was concluded by the branch manager that while some overcharges had been shown, they were the result of unintentional error. For this reason it was determined that the overcharges found did not generally justify the discharge of the persons involved, although two employees were discharged because their explanation was not satisfactory.

The government's request alleged that the defendant since the entry of the injunction order "has knowingly, repeatedly, flagrantly, and wilfully disobeyed the said provisions of said judgment." This allegation was specifically denied by the defendant in its answer. While the defendant in its answer did not admit that the 191 sales were made above ceiling price in the manner and on the occasions detailed in the government's request, neither did it deny such sales but for the purpose of its answer assumed that they had been made. Any doubt as to the issue for trial was completely removed by counsel for the defendant in his opening statement, wherein he stated: "So our defense here is that, while we admit that there were sales made in excess of our selling prices, and also the ceiling prices, that they were not intentional; it was not by way of any spirit of intention to defy the order of

this Court or defy the regulations of the Price Administrator."

The court found that the 191 sales alleged and proven were made deliberately and that the defendant "has knowingly, repeatedly, flagrantly, and wilfully violated the terms and provisions of the said injunction * * * and is guilty of criminal contempt of court as charged." Whether this finding is supported by substantial evidence is the overshadowing issue presented on this appeal. Neither the plaintiff nor the defendant, either by their affidavits or by oral proof, sought to contradict in any material respect the proof offered by the other. Plaintiff in support of the finding relies entirely upon the fact that sales were made by the defendant at over ceiling prices in the manner alleged, proven and admitted. The case was tried by the plaintiff and is presented to this court on the theory that the intent with which the overcharges were made was immaterial, but if it was, the burden was upon the defendant to disprove such intent.

That this was and is plaintiff's theory is shown by its statement of the contested issue on this point as follows: "Whether a denial of intent to commit contempt is a defense in a prosecution for criminal contempt, and whether such defense was in fact proved." That this is and was its theory is further evidenced by its argument here. In its brief it states:

"As we have heretofore pointed out, the uncontradicted testimony of the witnesses for the plaintiff shows that they purchased 191 food items at 31 stores of the defendant and were charged overceiling prices in each and every instance; that the one and only defense relied upon by the defendant in its sworn answer, in the opening statement of its attorney and by the testimony of its witnesses was that the violations were not intentional. In other words, all of the violations charged were admitted by the defendant, and we submit that no better proof is necessary or possible.

"The contention of the defendant that a criminal contempt is a crime and that intent is a necessary element is incorrect and misleading."

The plaintiff in its brief also states: "In the instant case the knowledge of the entry of the injunction order, as well as the violations, are admitted and therefore innocent intent, even if proved, is no defense."

This argument is made in face of the fact that plaintiff created the issue by alleging that defendant's over ceiling charges were made knowingly and wilfully. The issue was accepted by the defendant and was the only matter in controversy at the commencement of the trial. Without this issue it is difficult to discern any occasion for the lengthy trial which ensued for, as already shown, the defendant had conceded prior to the commencement of the trial that overcharges had been made; in fact, defendant brought to the attention of the court from its own survey that such was the case. With this situation disclosed by the record, we think the plaintiff is in a poor position, in fact well near precluded, from contending that intent was not an essential element of the offense and in disputing that the burden was upon it to establish such intent.[1]

Notwithstanding the state of the record, we have examined the authorities with a view of ascertaining the essential elements necessary to be alleged and proven in order to justify a conviction for criminal contempt. It is plain that a defendant is entitled to all the protection afforded a defendant in an ordinary criminal case and that the burden is upon the government to establish his guilt beyond a reasonable doubt. In Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 444, 31 S.Ct. 492, 499, 55 L.Ed. 797, 34 L.R.A.,N, S., 874, the court stated: "* * * it is certain that in proceedings for criminal contempt the defendant is presumed to be innocent, he must be proved to be guilty

---

[1] While the issue tried was whether the overcharges were made knowingly and wilfully, the issue here is made dependent upon whether they were intentionally made. "Wilful" as defined by the courts appears to be a word of broader scope than "intentional." United States v. Mur- dock, 290 U.S. 389, 394, 54 S.Ct. 223, 78 L.Ed. 381, and Bowles v. Ammon et al., D.C., 61 F.Supp. 106, 117. We think in the instant situation it is immaterial whether "wilful" or "intentional" be employed to characterize defendant's conduct.

beyond a reasonable doubt, and cannot be compelled to testify against himself."

To the same effect are Parker v. United States, 1 Cir., 153 F.2d 66, 70, 163 A.L.R. 379; Jones v. United States, 7 Cir., 209 F. 585, 587, and Kelly v. United States, 9 Cir., 250 F. 947, 949.

In Wilson v. State of North Carolina, 169 U.S. 586, 600, 18 S.Ct. 435, 42 L.Ed. 865, the court in a contempt proceeding ordered the rule discharged because the evidence failed to disclose an intentional contempt on the part of the relator. In In re Rice, C.C., 181 F. 217, 228, the court discharged a defendant charged with contempt of a court order and in doing so stated: "No one can be punished for a criminal contempt unless the evidence makes it clear that he intended to commit it. To [the] doubt is to be resolved in favor of respondent."

The plaintiff, however, relies upon other language found in this opinion as being applicable in the instant case. The court stated, 181 F. at page 223: "He [defendant] could not be heard to say he did not intend to defy the authority of the court when he transferred the stock in the face of the order, known to him, forbidding it. One is always held to intend the direct, natural, and probable consequences of acts intentionally done. Wrongful acts knowingly or intentionally committed can neither be justified nor excused on the ground of innocent intent. The color of the act determines the complexion of the intent."

We do not discern in this statement any benefit to the plaintiff here. We do not have a contention merely that the defendant did not intend to defy the authority of the court but that it did not intentionally commit the acts relied upon to prove such defiance. Here the wrongful acts are admitted but it is asserted that they were not knowingly or intentionally committed.

The government cites and relies upon a number of cases in support of the contention that the law in a case of the instant character imputes intent. All of such cases, however, were for a violation of a statutory provision and were not concerned with criminal contempt. Typical of such cases is that of Armour Packing Co. v. United States, 209 U.S. 56, 28 S.Ct. 428, 52 L.Ed. 681, wherein the defendant was prosecuted for obtaining an unlawful concession from the railroad in the matter of freight rates. The court stated, 209 U.S. at page 85, 28 S.Ct. at page 437: "* * * there is a class of cases within which we think the one under consideration falls, where purposely doing a thing prohibited by statute may amount to an offense, although the act does not involve turpitude or moral wrong."

In the instant case the court's order did not enjoin the making of sales but was only directed at sales made in a certain manner, that is, at a price above the ceiling. Of course, defendant purposely made the sales but the very question in issue is whether it purposely made them at prices in excess of the ceiling. The court in the Armour case left undecided a question which if answered, would be more relevant to the instant situation. The court stated, 209 U.S. at page 85, 28 S.Ct. at page 437: "Whether shippers who pay a rate under the honest belief that it is the lawfully established rate, when in fact it is not, are liable under the statute because of a duty resting on them to inform themselves as to the existence of the elements essential to establish a rate as required by law, is a question not decided * * *."

Another case much relied upon by the government is that of Hargrove v. United States, 5 Cir., 67 F.2d 820, 90 A.L.R. 1276. There the defendant was charged with wilfully failing to make an income tax return and wilfully evading taxes. Plaintiff stresses the court's statement, 67 F.2d at page 823: "The court here fell into the error of not distinguishing between the elements of an offense, where the statute simply denounces the doing of an act as criminal, and where it denounces as criminal only its willful doing. In the first class of cases, especially in those offenses mala prohibita, the law imputes the intent. * * * In the second class of cases, a specific wrongful intent, that is, actual knowledge of the existence of obligation and a wrongful intent to evade it, is of the essence."

Plaintiff classifies the instant situation within the first class of cases referred to by the court in this quotation. We think it more properly belongs in the second class. At any rate, plaintiff in its pleading charged that the acts complained of were knowingly and wilfully committed. That was the issue plaintiff presented for trial, and we think it is too late to compare the instant charge with one predicated upon a statutory provision which denounces the doing of an act as criminal and where intent is imputed to the offender.

It is interesting and perhaps pertinent to note that in a criminal prosecution for violation of the Emergency Price Control Act, 50 U.S.C.A. Appendix, § 901 et seq., by making sales at over ceiling prices, it was incumbent upon the government, as is shown by Yakus v. United States, 321 U.S. 414, 447, 64 S.Ct. 660, 678, 88 L.Ed. 834; to allege and prove that the defendant "had violated the statute by willful disobedience of a price regulation." Referring to the same point, the court in Bowles, Administrator, v. Hasting, 5 Cir., 146 F.2d 94, 95, stated: "Wilfulness in violation is made a necessary ingredient for criminal punishment * * *." It therefore appears that if the government had instituted a criminal action against the defendant or any of its employees, it would have been required to allege and prove that the overcharges were wilfully and deliberately made. Is there any reason to think in the instant proceeding, criminal in its nature, that its burden is any less? The plaintiff, however, as already shown, not only denies that intent is an essential element but argues that even so the burden is upon the defendant to prove it. It would make the issue and the burden of proof as in a civil proceeding, where a person who sells at a price above the ceiling may be liable for treble damages. Title 50 U.S.C.A.Appendix, § 925. In such an action, however, Congress expressly provided there could be no recovery if "the violation * * * was neither wilfull nor the result of failure to take practicable precautions against the occurrence of the violation." Thus, in a criminal prosecution wilfullness is an essential element to be alleged and proven by the government, while in a civil action the absence of wilfullness is a defense, with the burden of proof upon the defendant.

Plaintiff also argues "that a denial of intent to commit contempt of court is not a defense in a prosecution for criminal contempt." A number of cases are cited in support of this contention, typical of which are Merrimack River Savings Bank v. City of Clay Center, 219 U.S. 527, 536, 31 S.Ct. 295, 55 L.Ed. 320, Ann.Cas.1912A, 513, and Kelly v. United States, 9 Cir., 250 F. 947, 950. Little need be said of this contention or these authorities. They are beside the point. True, the defendant in the instant case in the concluding part of its answer alleged that it did not intend to commit contempt, but its real defense is found in its denial of the plaintiff's charge that it knowingly and wilfully made the overcharges as alleged. Obviously a person who knowingly and wilfully commits an act which he is enjoined from doing is in contempt. In the Merrimack case respondents knowingly and wilfully tore down poles and wires, which constituted a violation of an injunction. In the Kelly case, attorneys for certain of the defendants during the trial of a criminal case knowingly visited and conversed with certain members of the jury. As the court pointed out, 250 F. at page 950: "It is sufficient if such acts and communications were knowingly and willfully done and had, and had the tendency to influence improperly the action of the jury."

■ We are of the view that the intent with which the overcharges were made is an essential element of the contempt charged and that the burden was upon the plaintiff to establish such element beyond all reasonable doubt. It follows that the theory on which plaintiff tried the case below, as well as that advanced here, must be rejected. If this case had been decided by a jury on this erroneous theory of law, it seems certain that a reversal of the judgment would be required. We see no reason why there should be a different result where the case was tried by the court. Our difficulty in this respect arises from the fact that we are unable to determine whether the court employed this erroneous theory in making its findings and

conclusions of law. True, the court made the ultimate finding that the 191 sales alleged and proven were made deliberately and that the defendant "has knowingly, repeatedly, flagrantly, and wilfully violated the terms and provisions of the said judgment * * * and is guilty of criminal contempt of court as charged." This ultimate finding is repeated in the court's conclusions of law and in its judgment order. The court makes no evidentiary findings as a basis for its ultimate finding other than that sales were made at over ceiling prices as alleged by the plaintiff and as disclosed by the defendant. So it appears that the court predicated its ultimate finding solely upon the fact that such overcharges were shown. There is nothing in the court's oral opinion, in its findings or conclusions of law, to show whether it placed the burden of proving the essential element of intent upon the plaintiff or the defendant.

Notwithstanding the uncertainty of the record in this respect, we shall proceed to determine whether this essential finding of the court below is supported by substantial evidence. In making this determination it should be kept in mind, as already noted, that the sole evidence relied upon by the plaintiff is the fact that sales were made at over ceiling prices. Plaintiff in its brief states: "We submit that not only is there substantial evidence in the record to support the findings and judgment of the court but that they are supported by all the evidence in the case. They are supported by the uncontradicted testimony of the witnesses for the plaintiff and by the admissions of the defendant."

While we recognize the well established rule that intent, knowledge or wilfulness, where an essential element of an offense, may be inferred from the facts and circumstances in proof and form a proper basis for a finding, the difficulty here is that there are not, so far as we can ascertain, any such circumstances in proof except the mere fact that items were sold at over ceiling prices. In fact, as already shown, the plaintiff makes no contention to the contrary but asserts that the mere proof of such overcharges is sufficient. While the government's proof as to the over

ceiling charges as alleged is not contradicted, it should also be kept in mind that the voluminous proof offered by the defendant which shows or at any rate tends to show the good faith effort which it made to comply with ceiling prices and the injunction is also undisputed.

It would perhaps serve no useful purpose and would unduly prolong this opinion to relate in detail the means and devices employed by the defendant in its effort to obtain compliance. We have heretofore stated the more important allegations of its answer and we think it sufficient to note that its proof supported the factual allegations as made. The court in its oral opinion came close to exonerating the defendant and dispelling any inference that the overcharges were made knowingly and wilfully. The court states:

"The respondent did quite a considerable number of the things that a merchant who desired in good faith to comply with the rules and regulations issued under the Price Control Act, would do. It told these store managers and meat cutters of the injunction. It issued bulletins from time to time urging them to comply with the ceiling prices, and not to sell in excess of the ceiling prices. It shopped its stores for the purpose of determining whether or not its employes were selling in excess of the ceiling prices. * * *

"But the Court is convinced that the respondent failed to do the one thing of first importance which a merchant who desired in good faith to comply with the OPA rules and regulations would do, and that was to convince its employes that it meant what it said."

The court fails to point out what more the defendant could have done to impress upon its employees its honest and good faith effort to comply with ceiling prices. Plaintiff in its brief, however, makes the puerile suggestion that the defendant should have discharged the offenders. In all probability such action would have resulted in the substitution of inexperienced for experienced employees, and errors would have increased rather than decreased. Moreover, even though such drastic action was required in a good

faith effort to obtain compliance, it could not have been employed by the defendant as to the 191 sales at over ceiling prices upon which plaintiff relies. This is so for the reason that these overcharge sales were made to secret agents who reported only to the OPA, and defendant had no knowledge of such sales until the filing of the plaintiff's affidavits in support of its request for prosecution. As to the violations disclosed by its own shopping service, we think the defendant did what any responsible business concern would do. It thoroughly investigated the overcharges thus disclosed, the matter was taken up personally with the employees responsible therefor who were informed that a repetition of such overcharges would result in their discharge. In fact, two employees were discharged where the defendant determined that the overcharges had been made wilfully.. Viewing the situation with which defendant was confronted in fanciful retrospect is quite different from facing it in reality, as defendant was required to do. It is a matter of common knowledge that during the time pertinent to the instant proceeding labor was scarce and competent help was difficult to obtain. The record discloses that defendant had a large labor turnover. It reinstated many former employees who had returned from the service. It was faced with the continuing problem of training new help, particularly as to the OPA rules, regulations and ceiling prices. To argue that defendant under such circumstances should have discharged its employees because of their mistakes seems no more reasonable than to argue that it should have closed the stores and ceased to do business in order to obtain compliance.

Plaintiff in its endeavor to attribute to the defendant an ulterior motive argues that the overcharges meant an increased profit to the defendant. We suppose the defendant was in business for the purpose of making profits and that its profits would depend upon the amount of money it received for its merchandise. This profit motive, however, without proof otherwise, can only be attributed to a desire to make legal profits and not those which result from a violation of law. Furthermore,

defendant's employees were all on a straight salary basis. All the violations relied upon were those committed by these salaried employees. Plaintiff's witnesses testified that the price paid for the articles purchased, including the overcharges, was paid to the store cashier. It seems quite plain, at any rate there is no evidence to the contrary, that the employees who made such overcharges did not profit in any manner thereby. It hardly seems reasonable that these salaried employees would be interested in the amount of profits made by defendant to the extent that they would be willing to deliberately make overcharges in violation of the law as well as the court's injunction, of which they all had knowledge. We think there is no merit to this profit motive argument, and in any event there is no evidence upon which it can be supported.

Plaintiff attempts to discredit defendant's shopping service by intimating that it was for the purpose of determining whether or not defendant was losing money. We do not see how it could have served such purpose, and we think that the intimation is unfounded. In fact, defendant's shopping service and the use which it made of the information thus obtained is, in our judgment, a potent factor in demonstrating its good faith. True, it discovered that errors were being committed but it made no attempt to secrete either from the plaintiff or the court the information thus obtained. In fact, it disclosed such information to the court at the first opportunity by alleging in its answer the result of the survey. It produced and offered in evidence at the trial an exhibit which contained a summary of the information thus disclosed. In other words, when charged by plaintiff with making sales at over ceiling prices it made no denial but said in effect that its own survey showed as much but that such overcharges, both those pointed out by plaintiff and those shown by its survey, were unintentional and the result of mistake. More than that, a defendant official testified that the survey was being continued at the time of the trial, which showed that sales had been made at over ceiling prices while the trial was in progress. Thus, according to plain-

tiff's theory, we have the novel situation where the defendant gathered and produced in court the evidence necessary to show it guilty of criminal contempt. We think it is far more reasonable to think that its purpose was to acquire information which would aid it in complying and that the information thus acquired was exhibited to the court as a demonstration of its good faith, as well as the difficult if not impossible situation with which it was confronted.

■ Much is said by plaintiff concerning the fact that the defendant made no denial of the overcharges itemized in the request for prosecution. This appears to have been a point much relied upon by the trial court. It stated in its oral opinion, referring to such overcharges: "The fact is the evidence on that score is all one way." This argument begs the question and is merely another way of saying that proof of the overcharges alone is sufficient, irrespective of whether they were made knowingly and wilfully. We think this theory is not tenable. While the defendant, as shown, conceded that the overcharges were made, it could not from the very nature of the situation have well done otherwise. Plaintiff's secret agents when making a purchase did not obtain the name of the employee from whom the purchase was made, they did not call it to his attention either at the time of the sale or later, and neither did they report or call the overcharge to the attention of the defendant. Such purchases were reported to the plaintiff and kept carefully within its bosom until the commencement of the instant proceeding. Obviously the defendant was in no position to dispute this character of testimony because it had no way of knowing from which of its numerous employees the alleged purchases had been made. The employee not being identified, there was no opportunity either to deny or explain the circumstances relative to a particular sale. This appears to be an appropriate point to suggest that plaintiff had a better opportunity than the defendant to reprimand the employees who made these 191 sales. It was the sole possessor of the proof of the violations alleged. The injunction was also directed at the employees who were sub-

ject, as was the defendant, to a contempt proceeding or a criminal prosecution. If the purchases upon which plaintiff relied were accompanied by circumstances which showed that the overcharges were deliberately, wilfully and knowingly made, it would seem that the offenders should have been proceeded against at once and not permitted to continue their unlawful activities as plaintiff now asserts they did.

■ We are not unmindful of the important role performed by plaintiff during and following the recent war and of the almost superhuman difficulties with which it was confronted. Neither are we unmindful of the difficulties confronting a person in business who honestly and in good faith attempted to comply with the innumerable price lists and regulations which were promulgated by the plaintiff. It is a matter of common knowledge that an individual merchant with two or three employees under his personal supervision was unable, however good his intentions, to achieve complete compliance in the matter of prices. Often he was confused and bewildered in an effort to interpret the regulations, much less obtain compliance. As the magnitude of a business increased, with its personal supervision further removed, we apprehend that the difficulties were correspondingly enhanced. Certainly 100% compliance could not be expected in any event; in fact, it would be impossible. Just what degree of compliance could reasonably be expected from a concern of the magnitude of defendant with its 122 meat markets carrying from 250 to 300 separate items of meat, relying solely upon several hundred employees in making its sales, might be a matter of opinion, but undoubtedly many unintentional errors could reasonably be anticipated. The most that the record shows in this case is that such errors occurred. It does not follow, however, that they were made deliberately and intentionally.

■ It is therefore our conclusion that there is no substantial evidence to support the finding that defendant's overcharges were made deliberately, knowingly and wilfully. It follows that the judgment appealed from cannot stand.

178

We have noted plaintiff's point that the sufficiency of the evidence to support the judgment has not been properly reserved for review. We think there is no merit in the point. Also, in view of the conclusion which we have reached, we find it unnecessary to consider other issues raised on this appeal.

The judgment is reversed and the cause remanded, with directions that the rule to show cause be dismissed.