UNITED STATES of America and
Interstate Commerce Commission,
Petitioners and Appellees,

v.

The GREYHOUND CORPORATION
and Greyhound Lines, Inc., Respondents and Appellants.

No. 74–1124.

United States Court of Appeals,
Seventh Circuit.

Argued May 29, 1974.

Decided Dec. 24, 1974.

**530**

Thomas E. Kauper, Asst. Atty. Gen., Richard H. Sayler, Lee I. Weintraub, Joel Davidow, Dept. of Justice, Washington, D. C., Bernard A. Gould, Robert S. Turkington, A. James Gilmore, Attys., Interstate Commerce Commission, for petitioners and appellees.

William W. Schwarzer, John R. Reese, Lynn H. Pasahow, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., Edmund J. Kenny, Winston & Strawn, Chicago, Ill., Robert J. Bernard, W. L. McCracken, San Francisco, Cal., for respondents and appellants.

Before CLARK, Associate Justice,[*] and FAIRCHILD and PELL, Circuit Judges.

PELL, Circuit Judge.

The Greyhound Corporation and its wholly owned subsidiary Greyhound Lines, Inc. (collectively, Greyhound) appeal from a conviction of criminal contempt, under 18 U.S.C. § 401(3),[1] for willfully violating certain provisions of an order entered by a three-judge district court. The principal issue on appeal is whether the evidence was sufficient to prove that the violations of the order were willful.

I

The background of this case dates back to 1947. Greyhound, a common carrier operating throughout most of the United States, sought and obtained, between 1947 and 1956, approval of the Interstate Commerce Commission (ICC) for the acquisition of eight bus companies and their routes in the western United States. Mt. Hood Stages, Inc. (Mt. Hood), doing business as Pacific Trailways, is a common carrier authorized to operate in Oregon, Idaho, and Utah. At the acquisition hearings before the ICC, Mt. Hood opposed a number of the acquisitions, pointing out that its north-south route through central Oregon was being completely encircled by Greyhound. To overcome this opposition, Greyhound officers made certain representations to the ICC concerning Greyhound's policies and implementing practices with regard to Mt. Hood. Following the making of these representations Mt. Hood withdrew at least some of its objections to acquisitions.

In 1964 Mt. Hood petitioned the ICC to reopen the acquisition proceedings and sought a supplemental ICC order, under 49 U.S.C. § 5(9), specifically enforcing the representations and assurances made to the ICC by Greyhound during the previous acquisition proceedings. The ICC hearing examiner found that Greyhound was violating a number of representations made during the earlier hearings; this finding was adopted by Division Three of the ICC.[2] Generally, the ICC found that Greyhound had made specific representations in the prior acquisition proceedings which amounted to assur-

---

[*] Associate Justice Tom C. Clark (Retired) of the Supreme Court of the United States is sitting by designation.

1. 18 U.S.C. § 401(3) provides:

"A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

\* \* \* \* \* \*

(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

2. Mt. Hood States, Inc.—Petition for Modification, 104 M.C.C. 449 (1968).

ances of public benefit and interest and no harm to existing carriers or service. The failure of Greyhound to abide by its commitments, without sound reasons, Division Three observed, "constitute[d] destructive competition in contravention of the national transportation policy." 104 M.C.C. at 463. The ICC, however, did not enter a specific order but, rather, gave Greyhound time voluntarily to conform its practices to its representations.

Greyhound did not voluntarily conform and in 1968 the full ICC entered an order directing Greyhound, *inter alia,* to cease and desist from "all practices of the character found in the prior reports of Division 3 [of the ICC] and the hearing examiner to be unreasonable and inconsistent with [Greyhound's] representations in the above-entitled proceedings . . .." The ICC denied Greyhound's subsequent petition for reconsideration, and Greyhound petitioned for judicial review.

A three-judge district court denied Greyhound's motion to set aside the ICC order and granted the Government's counterclaim for enforcement of its order.[3] The court issued a ten-paragraph order, the portions of which are material to this appeal are set out in the margin.[4]

In June 1971, the Government filed petitions charging Greyhound with criminal and civil contempt for failing to comply with the order of the three-judge district court. After a bench trial, Chief Judge Robson, in a careful and detailed opinion, found Greyhound in criminal contempt of five paragraphs of the order and in civil contempt of three paragraphs.[5] The court fined Greyhound Corporation $100,000 and Greyhound Lines, Inc. $500,000 for their criminal contempt.[6] Greyhound has appealed from the criminal contempt convictions and the fines imposed under these convictions.

## II

Greyhound concedes, there being no appeal of the civil contempt judgment, that it violated the 1970 order of the three-judge district court but argues that the evidence was insufficient to prove that the violations were willful.

Willfulness is, of course, an element of criminal contempt and must be proved beyond a reasonable doubt. In re Brown, 147 U.S.App.D.C. 156, 454 F.2d 999, 1006 (1971); United States ex rel. Porter v. Kroger Grocery & Baking Co., 163 F.2d 168, 173–174 (7th Cir. 1947). In United States v. Seale, 461 F.2d 345, 368 (7th Cir. 1972), a criminal contempt case involving alleged disruption and obstruction within a trial, this court noted that "[t]he minimum requisite intent [for criminal contempt] is better defined as a

---

3. The decision of the three-judge district court is reported at Greyhound Lines, Inc. v. United States, 308 F.Supp. 1033 (N.D.Ill.1970).

4. "It is ordered that Greyhound Lines, Inc. and Greyhound Corporation restore practices and traffic patterns in existence or in contemplation as of July 30, 1952, in particular:

 (1) that Greyhound show Mt. Hood schedules in Greyhound folders on an equal basis with other non-Greyhound lines;

 \*　\*　\*　\*　\*　\*

 (3) that Greyhound revise its interline schedules in connection with Mt. Hood so as to eliminate the presently existing delay of approximately three hours for passengers seeking to travel between California and Spokane via Mt. Hood's route and to negotiate in good faith with Mt. Hood on the establishment of bus schedules most advantageous to the traveling public;

 (4) that Greyhound voluntarily and accurately quote joint through routes in connec-

 tion with Mt. Hood, without geographical limitations in a manner fully responsive to inquiries from the traveling public;

 (5) that Greyhound cease and desist from quoting Mt. Hood's service unfavorably or inaccurately in response to inquiries from the traveling public and from not quoting Mt. Hood's service at all in response to specific requests from the traveling public;

 (6) that Greyhound show Mt. Hood's connecting routes on its maps on an equal basis with other non-Greyhound carriers;

 \*　\*　\*　\*　\*　\*

 July 30, 1952 was the date of the decision on one of the acquisition proceedings.

5. The district court's decision is reported at United States v. Greyhound Corp., 363 F.Supp. 525 (N.D.Ill.1973).

6. The district court's decision concerning sanctions is reported at United States v. Greyhound Corp., 370 F.Supp. 881 (N.D.Ill. 1974).

volitional act done by one who knows or should reasonably be aware that his conduct is wrongful." A finding of criminal contempt cannot stand, moreover, if the court's order is vague or uncertain. International Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 76, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967). Greyhound relies substantially on the claimed obnubilation of the three-judge court order.

 Willfulness for criminal contempt may, as in other areas of criminal law, be inferred from the facts and circumstances in proof. *Kroger Grocery, supra.* In cases involving in-court obstruction or disruption, such as *Seale,* these facts and circumstances will typically involve simply the conduct and statements occurring during the trial. In a criminal contempt case involving a court order, such as the one before us, on the other hand, the court should consider the entire background behind the order—including the conduct that the order was meant to enjoin or secure, the interests that it was trying to protect, the manner in which it was trying to protect them, and any past violations and warnings—in determining whether the order is sufficiently specific and in determining whether the defendant knew or should have known that his conduct was wrongful.[7] Terminal R.R. Ass'n v. United States, 266 U.S. 17, 29, 45 S.Ct. 5, 69 L.Ed. 150 (1924); United States v. Christie Indus., Inc., 465 F.2d 1002, 1007 (3d Cir. 1972).

 Willfulness, for the purpose of criminal contempt, does not exist where there is a "[g]ood faith pursuit of a plausible though mistaken alternative." In re Brown, *supra,* 454 F.2d at 1007. To provide a defense to criminal contempt, the mistaken construction must be one which was adopted in good faith and which, given the background and purpose of the order, is plausible. The defendant may not avoid criminal contempt by "twisted interpretations" or "tortured constructions" of the provisions of the order. United States v. Gamewell, 95 F.Supp. 9, 13 (D.Mass. 1951). See also United States v. Christie Indus., Inc., *supra,* 465 F.2d at 1007. As Chief Judge Robson noted, a defendant, if he has doubts as to his obligations under an order, may petition the court for a clarification or construction of that order. 363 F.Supp. at 534. See McComb v. Jacksonville Paper Co., 336 U.S. 187, 192, 69 S.Ct. 497, 93 L.Ed. 599 (1949). While a defendant is, of course, not required to seek such a clarification, a failure to do so when combined with actions based upon a twisted or implausible interpretation of the order will be strong evidence of a willful violation of the decree.[8] Federal Trade Comm'n v. Gladstone, 450 F.2d 913, 915 (5th Cir. 1971); United States v. Tijerina, 412 F.2d 661, 667 (10th Cir. 1969), cert. denied, 396 U.S. 990, 90 S.Ct. 478, 24 L.Ed.2d 452.

 Similarly, while actions showing a good faith effort to comply with the order will tend to negate willfulness, *Kroger Grocery, supra,* delaying tactics, indifference to the order, or mere "paper compliance" will support a finding of willfulness. In re Holland Furnace Co., 341 F.2d 548, 551 (7th Cir. 1965), cert. denied, 381 U.S. 924, 85 S.Ct. 1559, 14 L.Ed.2d 683. The very issuance of the order puts the party on notice that his past acts have been wrongful. "No concept of basic fairness is violated by re-

---

**7.** We also note that in criminal contempt cases involving disobedience of court orders, "[t]he element of personal insult that may offend a judge and impair his deliberate judgment is not present . . . as it is in many disruption and obstruction cases . . . .." Dobbs, Contempt of Court: A Survey, 56 Cornell L.Rev. 183, 219 (1971).

**8.** Greyhound suggests that Chief Judge Robson applied an erroneous standard of willfulness in stating that "a party who makes his own determination as to the meaning of a decree, acts at his peril." 363 F.Supp. at 534. When this statement is read in context, however, it is clear that Chief Judge Robson was merely stating, in slightly different terms, what we have stated above: that willfulness may be inferred from a reliance on a twisted or implausible interpretation of the order, especially where there was no attempt to seek a clarification of the order.

quiring a person in this position to be more than normally careful in his future conduct." United States v. Custer Channel Wing Corp., 247 F.Supp. 481, 496 (D.Md.1965), aff'd, 376 F.2d 675 (4th Cir. 1967), cert. denied, 389 U.S. 850, 88 S.Ct. 38, 19 L.Ed.2d 119.

### III

We turn now to the specific paragraphs of the order as to which Greyhound was found to be in criminal contempt.

### A

Paragraph 1 of the order requires:

"that Greyhound show Mt. Hood schedules in Greyhound folders on an equal basis with other non-Greyhound lines."

The district court in finding that Greyhound had violated this provision interpreted the phrase "on an equal basis" to mean that Mt. Hood should be treated at least as well as other non-Greyhound carriers. Having reviewed the record, we conclude that the evidence was more than sufficient to support Chief Judge Robson's finding that Greyhound's violation of this provision was willful.

We note first that Greyhound unreasonably delayed in complying with this paragraph of the order. Rather than taking special care to include Mt. Hood schedules in its folders, Greyhound, as was pointed out below, did not make many of the required changes until after the contempt petitions were filed,[9] which was eighteen months after the court order was entered. We agree with Chief Judge Robson that "Greyhound's failure to effect corrections for this length of time hardly evinces an attitude of good faith or cooperation." 363 F.Supp. at 537.

Moreover, Greyhound's explanation of its failure to comply with this provision consists of strained and twisted interpretations of the order. Greyhound contends, first, that since the order did not specify the exact charts and folders in which Mt. Hood schedules were to be included, Greyhound could not know that it was not in compliance with the order. In addition, Greyhound argues that "on an equal basis" should be interpreted as permitting Greyhound to make certain distinctions between non-Greyhound lines. Each omission of a Mt. Hood schedule can be justified, according to Greyhound, on the ground that Greyhound does make such distinctions between non-Greyhound lines and, in each instance referred to by Chief Judge Robson, Mt. Hood just happened to fall into the group of non-Greyhound lines which was not included in the particular folder or chart. No other single non-Greyhound carrier, according to Greyhound, had been given all of the "benefits" to which Chief Judge Robson found Mt. Hood to be entitled.

These interpretations of the order are patently unreasonable. The purpose of the order was to insure that Greyhound would not continue its predatory conduct and "destructive competition" toward Mt. Hood (104 M.C.C. at 463) but would, rather, comply with the representations made by its officers at the acquisition hearings. These representations included broad statements that Greyhound "has always carried [Mt. Hood's] schedules in its schedule folders." 104 M.C.C. at 476. There were no conditions or qualifications placed on these representations or on the subsequent order.[10] Yet Greyhound's reading of the order would, for all practical purposes, render this provision a nullity. For whenever an omission was pointed out, Greyhound could either note that the order did not refer to the particular chart or table in question or Greyhound could find some basis to distinguish Mt. Hood from the non-Greyhound lines which were includ-

---

9. To the extent that Greyhound argues that the district court was in effect finding some sort of an admission of willfulness in Greyhound's eventual compliance, and that this contravenes public policy by penalizing one

who makes improvements, we agree with the ICC that the record does not support such an argument.

10. The order, moreover, is stated in terms of the plural "non-Greyhound *lines.*"

ed in the chart or table. The combination of such twisted interpretations of the order and Greyhound's failure to seek a clarification or modification of the order is significant evidence that Greyhound knew or reasonably should have known that its conduct was wrongful.

Finally, Chief Judge Robson's finding of willfulness is further supported by the fact that Greyhound had received numerous complaints from Mt. Hood about the schedules. We reject Greyhound's contention that the warnings from Mt. Hood can be dismissed as merely the complaints of an adversary. Mt. Hood initiated the ICC proceedings which led to the 1968 ICC order. It was, moreover, the direct beneficiary of both the ICC order and the three-judge district court order. The failure to show Mt. Hood schedules was specifically discussed at a meeting attended by officials of Greyhound, Mt. Hood, and the ICC in May 1970. Under these circumstances, Greyhound should have been particularly careful to investigate and remedy, where appropriate, the complaints of Mt. Hood.

Greyhound attempts to avoid the finding of willfulness by arguing that it was lulled into a false sense of security by the ICC. Greyhound points out that at the May 1970 meeting of the ICC, Greyhound, and Mt. Hood, Bernard Gould, Director of the ICC's Bureau of Enforcement, told Greyhound, after Mt. Hood's various complaints had been discussed, that the ICC field staff would investigate Greyhound to determine whether any enforcement action was necessary. Greyhound contends that when it did not hear from the ICC, it assumed that it was in compliance.

We note, however, that Gould testified that at the May 1970 meeting he indicated several respects in which he thought Greyhound was not in compliance. In particular, Gould testified: "I think the entire tenor of the conference left no doubt in anyone's mind that Greyhound had not fully complied. . . I believe certain of the schedules failed to list properly the Mount Hood Stages connections, and I indicated that I

thought that was a failure to comply." Moreover, although Gould did indicate that the ICC would investigate Greyhound, he clearly was, as Greyhound concedes, under no duty to inform Greyhound of the outcome of this investigation. The order itself was simple and straightforward; it concerned only one non-Greyhound carrier; Greyhound continually received complaints from Mt. Hood and on at least one occasion Gould indicated that he believed that Greyhound was not in compliance. Greyhound's position on this point would seem to border upon an argument that some sort of a duty rested upon the governmental agency which was conducting an investigation of claimed illegal activities to provide a running account to the charged party of violations developed during the course of the investigation. We reject such a contention. Given these factors and the strained interpretations which Greyhound now offers to excuse its noncompliance, the contention that it was somehow lulled into believing that it was in compliance wholly fails to persuade us.

B

Paragraph 3, containing two elements, requires:

"that Greyhound revise its interline schedules in connection with Mt. Hood so as to eliminate the presently existing delay of approximately three hours for passengers seeking to travel between California and Spokane via Mt. Hood's route and to negotiate in good faith with Mt. Hood on the establishment of bus schedules most advantageous to the traveling public."

We shall consider each part of this paragraph separately.

1. *Three-Hour Delay.*

Mt. Hood holds a certificate of public convenience and necessity for a bus route between Klamath Falls and Biggs (The Dalles), Oregon, a north-south route passing through central Oregon. Greyhound's acquisitions between 1947 and 1956, combined with its existing routes,

enabled Greyhound to completely encircle Mt. Hood and to by-pass Mt. Hood's north-south route by using its own coastal route through Portland. Mt. Hood's only link to points north of Biggs and south of Klamath Falls, however, is Greyhound.[11]

From 1949 to 1964, Mt. Hood and Greyhound operated a joint through bus between San Francisco, California, and Spokane, Washington, using the Mt. Hood route through central Oregon. In such a service, the passengers remain on the same bus (in this case a Greyhound bus leased and operated by Mt. Hood) throughout the trip and the bus travels over the routes of both bus companies. Greyhound and Mt. Hood also operated interline service over this route continuously from prior to 1964 to the present. Interline service, unlike a through bus, involves an exchange of passengers from the bus of one company to that of the other company at the point where the route of one company ends and the route of the other company begins. See Gilbertville Trucking Co., Inc. v. United States, 371 U.S. 115, 121 n. 2, 83 S.Ct. 217, 9 L.Ed.2d 177 (1962).

In 1964 Greyhound canceled the through-bus agreement with Mt. Hood and permanently rerouted its San Francisco-Spokane bus along the wholly Greyhound route through Portland, lengthening the trip by 110 miles. Mt. Hood's central Oregon route was then completely dependent on Greyhound connecting buses at Klamath Falls and Biggs, Oregon. In its 1964 petition to the ICC, Mt. Hood complained that after Greyhound terminated the joint through bus with Mt. Hood, Greyhound "changed its schedules between San Francisco and Klamath Falls and between Biggs and Spokane so as to break connections with

[Mt. Hood] and force a delay of nearly 3 hours for any passenger seeking to use the shorter route via [Mt. Hood]." 104 M.C.C. at 468.

Chief Judge Robson held that Greyhound had violated Paragraph 3 by failing to eliminate a three-hour delay at Biggs (The Dalles) and that this violation was willful.

Since Mt. Hood's Klamath Falls-Biggs route is met at both ends by Greyhound, Mt. Hood had no way of eliminating these delays itself. Rather, as Chief Judge Robson noted, "the condition that Paragraph 3 was designed to remedy, i. e., the elimination of the three-hour delay, was exclusively within Greyhound's control." 363 F.Supp. at 540. The requirement, moreover, does not appear onerous: it involved correcting the delays in the connections with a single non-Greyhound line on a single route. In any case, Greyhound never petitioned for a modification of the provision. Yet here again Greyhound delayed for an unreasonable length of time—eighteen months after the entry of the injunction—before making the changes ordered.

Furthermore, Greyhound once more offers wholly implausible interpretations of the order to excuse its noncompliance. Greyhound argues, as it did in the district court, that it reasonably believed it had complied with Paragraph 3 when it restored the joint through bus with Mt. Hood in April 1970. Paragraph 3, however, expressly refers to interline schedules, not the through bus.[12] A Greyhound official, although contending that he believed Greyhound to be in compliance with the order by restoring the through bus, admitted that there is a distinction between interline service and a through bus.[13] Moreover, as Chief

---

**11.** While we have referred in this opinion, as did the district court in the reported opinion below, to the predatory conduct of Greyhound directed toward Mt. Hood, we also cannot be unmindful that the orders entered were intended to protect the traveling public which has a substantial interest in reaching a destination by the least time-consuming and most economical route. Greyhound by its acquisitions in the Pacific Northwest had gained a

substantial market power there which lent itself readily to public abuse.

**12.** Greyhound erroneously contends that the district judge later suggested that interline service could include a joint through bus. See section C, *infra*.

**13.** "Q. Looking again at Paragraph 3 of the injunction, it refers, does it not, to interline service?

Judge Robson noted, Greyhound's reading of this part of Paragraph 3 would render it purposeless since Paragraph 2 already required the restoration of the joint through bus.

Focusing narrowly on the words "presently existing delay," Greyhound also asserts that the only delay existing when the court order was issued, in February 1970, was at Klamath Falls. Greyhound apparently argues that it could reasonably assume it was in compliance since Greyhound eliminated the Klamath Falls delay by shifting it to Biggs.

We agree with the Government that it is difficult to conceive of a more tortured reading of the injunction or of an interpretation further at odds with the purpose and history of the order. At the acquisition hearings, Greyhound represented that the acquisitions would "have no material adverse affect (sic) upon other carriers," and that "a short direct route will be made available for all passengers of applicant and all other bus companies . . . greatly reducing the possibilities of long, and oftimes over-night layovers." 104 M.C.C. at 476. In 1964 Division Three of the ICC, finding delays of nearly three hours in Greyhound's connections at Klamath Falls and Biggs stated, "[t]he only reasonable inference that can be drawn from the record is that the cancellation of the through bus and revision of time schedules were inspired by a desire to stifle competition." 104 M.C.C. at 461.[14] In 1970 the three-judge district court similarly noted that the evidence had indicated and the ICC had found that Greyhound had "arranged its north and south connecting schedules so as to destroy the advantages of Mt. Hood's route (i. e., by creating long layovers at points on the Klamath Falls route . . .)." 308 F.Supp. at 1036. The very purpose of the injunction, as stated, was to eliminate Greyhound's discrimination and destructive practices toward Mt. Hood.

When the order is viewed against its background and purpose, it is clear that Greyhound's interpretation of the order is implausible and that Greyhound should reasonably have known that it was not complying with Paragraph 3 by shifting the three-hour delay from Klamath Falls to Biggs.

### 2. *Good Faith Negotiations.*

The second requirement of Paragraph 3 was that Greyhound "negotiate in good faith with Mt. Hood on the establishment of bus schedules most advantageous to the traveling public." The court below correctly observed that the duty to negotiate in good faith, while not including the duty to agree, does require an active participation in the deliberations, a sincere effort to overcome the obstacles or differences between the parties, and a duty to respond to a good faith proposal put forth by the other party. 363 F.Supp. at 541–542.

Chief Judge Robson, in finding that Greyhound had willfully failed to negotiate in good faith, noted that Mt. Hood officials met and corresponded several times with Greyhound officials; that at these meetings, Mt. Hood made specific proposals toward improving connections at Eugene, Oregon; that Greyhound took no action on these proposals, neither putting forth counterproposals nor implementing those suggested by Mt. Hood; that Greyhound did not take any actions with regard to the Eugene or the

A. Yes, sir.

Q. Now you distinguish, do you not, between interline service and joint through-bus service?

A. Yes.

Q. Now you agree, then, don't you, that that paragraph clearly does not refer to the establishment of through-bus schedules which is mentioned in other paragraphs of the injunction?

A. Yes, sir."

14. The ICC hearing examiner likewise had noted:

"schedules were adjusted to MH's disadvantage. To illustrate, the layover at The Dalles southbound was extended from 1 hour and 48 minutes to 2 hours and 40 minutes and at Klamath Falls from 15 minutes to 2 hours and 40 minutes. Northbound, there was a delay there of 2 hours and 30 minutes, whereas previously the breaks were fairly short." 104 M.C.C. at 495.

Burley connections for eighteen months, until after the contempt petitions were filed; that when Greyhound finally did make a change in the Eugene schedule, that change was basically that which Mt. Hood had suggested eighteen months earlier; that a Greyhound official admitted that it would have been no more difficult to implement this change in the Eugene schedule when it was first suggested by Mt. Hood in March 1970 than it was in November 1971.

There may be borderline cases where, although a court ultimately determines that a party has not negotiated in good faith, the party could reasonably have believed, prior to the court decision, that, because of the extent of its participation in the deliberations, it was negotiating in good faith. The situation before us, however, is far from being such a case. Greyhound did very little with respect to the negotiations other than attend the meetings: it did not respond to proposals, put forth counterproposals, or implement Mt. Hood's suggestions. We disagree with Greyhound's contention that, absent a "very positive effort" on Mt. Hood's part to secure an agreement, Greyhound could reasonably believe it was negotiating in good faith. Mt. Hood did put forth a specific proposal with regard to the Eugene connection and, as Chief Judge Robson pointed out, since Greyhound completely ignored this proposal, "it would appear to have been a useless act for Mt. Hood to have drawn up a detailed proposal with regard to the Burley connection." 363 F.Supp. at 541. Negotiation is, by definition, a two-way street. Greyhound should reasonably have known that, while it had no obligation to agree, doing nothing other than attending meetings was far from being within the scope of good faith negotiations.

### C

Paragraph 4 of the order requires:

"that Greyhound voluntarily and accurately quote joint through routes in connection with Mt. Hood, without geographical limitations in a manner fully responsive to inquiries from the traveling public."

Paragraph 5 requires:

"that Greyhound cease and desist from quoting Mt. Hood's service unfavorably or inaccurately in response to inquiries from the traveling public and from not quoting Mt. Hood service at all in response to specific requests from the traveling public."

Greyhound contends initially that the criminal contempt convictions relating to these paragraphs cannot stand since, in determining whether a violation existed, Chief Judge Robson utilized a standard not specified in the order. Under the district court's standard, an agent's failure to quote Mt. Hood service was considered not in compliance if the routes in connection with Mt. Hood "would have been shorter, faster, cheaper, and/or more convenient than the best all-Greyhound routing." 363 F.Supp. at 543.

As Chief Judge Robson noted, a court order, although it will not be expanded beyond the meaning of its terms in determining whether a party is in contempt, is subject to reasonable interpretation in light of the background of the order and the purpose for which it was entered. 363 F.Supp. at 544. The mere fact that such an interpretation is necessary does not render the injunction so vague and ambiguous that a party cannot know what is expected of him. Here, Greyhound officials had asserted, at the acquisition hearings, that it was not Greyhound's policy "to route passengers over a circuitous route over its line." 104 M.C.C. at 490. Moreover, in 1968, the ICC found that it was an unreasonable practice for Greyhound to fail "to require its agents to inform inquiring persons fully, accurately, and impartially of *shorter or faster or cheaper or equally desirable* joint through routes or fares . . . ." 363 F.Supp. at 544. The standard adopted by Chief Judge Robson is not only a reasonable interpretation of the order, it is consistent with the history and purpose of the order. Furthermore, we note that the alternative standard suggested by Greyhound

would "render the order practically unenforceable." 363 F.Supp. at 545.

Using this standard, Chief Judge Robson found literally hundreds of instances of unsatisfactory quotations. In particular, he noted that even after the filing of the contempt petitions in June 1971, ICC surveys showed a 51% rate of quoting errors. Greyhound argues that it is unfair to base a finding of willfulness on this, since no particular percentage of compliance was specified in the order. The 51% figure is significant, however, not only because of its size in absolute terms, but also because, as Chief Judge Robson pointed out, this was approximately the level of quoting violations found immediately after the court order was entered. Yet between these initial surveys and those in 1971, the ICC informed Greyhound that its agents were being monitored and that a high rate of error was being reported. Compliance, here again, was wholly within Greyhound's control. Under these circumstances, the fact that the error level remained about the same is strong evidence of willfulness.

It appears to us that Greyhound is in effect arguing that a court order should contain a percentage proviso before the party ordered could be found in violation. Or putting the contention into application, the order should have stated "if Greyhound fails to comply with this order half the time it will be deemed to have done so willfully." Noncompliance with court orders may be excused under some circumstances but we have not been shown that excusing circumstances existed here. Otherwise there should be compliance in full and certainly a failure to comply in approximately half of the instances checked is substantial evidence of a knowledgeable and willful failure.

Further evidence of willfulness is found in the wholly inadequate steps Greyhound took to achieve compliance on the part of its ticket agents. The inadequacy of Greyhound's compliance program is set out in detail in the district court opinion (363 F.Supp. at 554–560) and will not be repeated here. As Chief Judge Robson pointed out, Greyhound,

although not required by the order to take any specific steps to achieve compliance, was required to take all steps reasonably necessary to insure compliance with Paragraphs 4 and 5. We agree with Chief Judge Robson that the evidence indicates that Greyhound officials flagrantly disregarded the order and, at best, constructed a "paper compliance," which they should reasonably have known would be ineffective. The present case is, thus, in sharp contrast to *Kroger Grocery, supra,* where the prosecutor and district court failed "to point out what more the defendant could have done to impress upon its employees its honest and good faith effort to comply with [the court order]." 163 F.2d at 175. Rather, the lack of meaningful compliance efforts here is strikingly similar to the defendants' conduct in In re Holland Furnace Co., *supra,* where both a company and certain of its officers were held to be in criminal contempt for failing to obey a court order. Chief Judge Robson properly noted that "the record in this case shows that not only did the errors occur, but, when one considers the inadequate measures Greyhound took to achieve compliance, it was almost inevitable that errors would occur." 363 F.Supp. at 554.

Greyhound argues, however, that it reasonably interpreted Paragraph 4 as requiring only quotations of the Greyhound-Mt. Hood joint through bus and not the interline service. To support this contention, Greyhound notes that the district court, in discussing Paragraph 3, stated that there was a difference between a joint through bus and interline service. The critical factor is, however, that Paragraph 4 refers to "joint through *routes* in connection with Mt. Hood," and not to the joint through *bus.* Both joint through buses and interline service can be "joint through routes." "[T]he test of the existence of a 'through route' is whether the participating carriers hold themselves out as offering through transportation service." Thompson v. United States, 343 U.S. 549, 557, 72 S.Ct. 978, 983, 96 L.Ed. 1134 (1952). We agree with Chief Judge Rob-

son that, given the arrangements between Greyhound and Mt. Hood, Greyhound's contention that only the joint through bus is a joint through route is patently wrong. Moreover, Greyhound should reasonably have known that its interpretation was erroneous. The hearing examiner, in discussing Greyhound's failure to quote joint through routes, gave, as examples of this failure, instances in which Greyhound agents did not quote Greyhound-Mt. Hood interline service. Finally, we note that the plural form "routes" is used in Paragraph 4 and Greyhound concedes that there was only one joint through bus.

Finally, Greyhound argues that the district court erred in basing its finding of criminal contempt of Paragraph 5 on the finding that Greyhound had willfully violated Paragraph 4. This contention is frivolous. As Chief Judge Robson stated:

> "The court has already found that Greyhound did not conform with Paragraph 4 in that Greyhound did not voluntarily and *accurately* quote Mt. Hood's joint through routes. Having made that finding it necessarily follows that Greyhound was quoting Mt. Hood's routes unfavorably and *inaccurately*. For Paragraph 5 is, in part, a corollary of Paragraph 4. If there was a willful failure to comply with Paragraph 4, there necessarily was a willful failure to comply with Paragraph 5." 363 F.Supp. at 553–554. (Emphasis in original.)

### D

Paragraph 6 of the order requires:

> "that Greyhound show Mt. Hood's connecting routes on its maps on an equal basis with other non-Greyhound carriers."

The district court found that Greyhound violated this paragraph by failing to show Mt. Hood services on an equal basis with other non-Greyhound lines. As in Paragraph 1, the district court interpreted "equal basis" to mean that Mt. Hood should be treated "at least as well as any other non-Greyhound carrier." 363 F.Supp. at 561.

The evidence is more than sufficient to support the district court's finding of willfulness. Here again the record indicates that Greyhound delayed in making the required changes: three maps that failed to depict Mt. Hood service on an equal basis were not corrected until November 1971, twenty months after the injunction was entered. During this period, moreover, Mt. Hood complained to Greyhound about the maps. Yet, as Chief Judge Robson noted, "[n]ot once during that period of delay did Greyhound ever complain to the ICC or the court that compliance would be a hardship, nor did it ever ask the court for a clarification or modification of the order, as it had a right to do, to determine whether the showing of Mt. Hood's routes on its wall maps was within the requirements of the order." 363 F.Supp. at 564. Under the circumstances, Greyhound knew or reasonably should have known that its conduct was wrongful.

In an attempt to excuse this noncompliance, Greyhound offers the same excuse that it did in connection with Paragraph 1, that is, that Greyhound reasonably believed that it could make distinctions among non-Greyhound lines and Mt. Hood just happened to fall into the group of non-Greyhound lines not shown on the map in each instance cited by the district court. This contention has no more merit with respect to Paragraph 6 than it did with respect to Paragraph 1. Greyhound represented at the acquisition hearings that it cooperated in every way to acquaint the public with Mt. Hood's services and, thereby, promoted additional traffic and business for that line. 104 M.C.C. at 452, 454. In its 1964 petition to the ICC, however, Mt. Hood complained that Greyhound had "discontinued showing [Mt. Hood's] connecting routes upon its maps, while continuing to display those of numerous other non-Greyhound carriers." 104 M.C.C. at 468. The hearing examiner found that Mt. Hood's charge was supported by the evidence and the examiner's finding was

adopted by Division Three and subsequently affirmed by the full ICC and the three-judge district court. Neither Greyhound's representations nor the court order was qualified in any way. Here, as in Paragraph 1, Greyhound's strained interpretation of the *order* would permit Greyhound, for all practical purposes, to avoid compliance. And, as with Paragraph 1, Greyhound sought no clarification or modification of the order.

### E

Generally, as applicable to most if not all of the paragraphs found to have been violated, we also note the following matters.

In the early years of this long drawn-out controversy there were internal Greyhound documents suggesting the routing of passengers over Greyhound's own longer route rather than over Mt. Hood's route. This intention to route passengers over the longer Greyhound route was not to be put into bulletins to the field men but was to be discussed confidentially with field men. It is not surprising that subsequent to the orders of the ICC and the three-judge court that even this type of internal document was not proved to exist. Very seldom does one who is willfully violating a court order, any more than does one in violating a criminal statute, proclaim by words what is being done. But the willful violation may be proved by action or inaction as graphically as though it had been proclaimed in descriptive words. As in criminal cases, criminal contempt proceedings permit the application of the "well established rule that intent, knowledge or willfulness, where an essential element of an offense, may be inferred from the facts and circumstances in proof and form a proper basis for a finding . . ." *Kroger Grocery, supra*, 163 F.2d at 175.

Greyhound lays particular emphasis on the preliminary paragraph of the three-judge court order and, in so doing, focuses on the word "practices," asserting that there was no proof that it was practicing in July 30, 1952, procedures which are now being held to be mandatory for it. This approach, however, ignores the qualifying words "in existence or in contemplation" as of the 1952 date which in turn brings into play the broad-sweeping representations made by Greyhound to achieve its acquisition purposes.

Greyhound also makes much of the fact that in some respects it had complied with the three-judge court order. The district court took cognizance of "Greyhound's eleventh hour remedial action." We have not attempted to evaluate in terms of comparative onerousness those parts of the order with which Greyhound chose to comply. It is sufficient to state that what we are concerned with here is the portions of the order as to which there was willful noncompliance. Nor are we much impressed by gunpoint compliance.

While Greyhound in March 1970 announced a program for compliance with the order of the three-judge district court, it is significant that it did not provide for sending copies of the injunction to its agents, or even for advising them of the existence of the court's order. See *Kroger Grocery, supra*, 163 F.2d at 175.

Greyhound argues that the order is too vague for it to know exactly what to do by way of compliance. The language of the order, particularly when read in the contextual background, refutes this contention. No appeal was taken from the order and as we have noted no effort was ever made to secure a clarification. It is not even now contended that there is an impossibility of compliance.

Greyhound also cites the increase of Mt. Hood traffic subsequent to the entry of the court's order. This, of course, does not mean that the potential of traffic which would have followed full compliance was reached. It does, however, tend to reflect that the traveling public does have a pocketbook interest in the least expensive routing between two points.

In sum, the record of this case shows a flagrant disregard of a court

order. The purpose of the order was to insure that Greyhound would comply with representations it made at the acquisition hearings and cease its predatory practices toward Mt. Hood. The language of the order was straightforward; the order pertained to a single non-Greyhound line which operated in only a few states in the country. The court injunction, moreover, ordered Greyhound to do essentially the same things which the ICC had ordered the company to do in 1968. Yet Greyhound repeatedly delayed in complying with the provisions of the order until after the contempt petitions were filed, despite continuing complaints from Mt. Hood. What compliance did occur was often mere "paper compliance." In the district court and in this court, Greyhound has sought to excuse its non-compliance with what can only be termed twisted and strained interpretations of the order. There is no doubt that Greyhound knew or should have known that its conduct violated the letter and spirit of the order.

## IV

■ Finally, Greyhound argues that the district judge erred in imposing fines aggregating $600,000 on Greyhound as a sanction for criminal contempt. In United States v. United Mine Workers, 330 U.S. 258, 303, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947), the Supreme Court set forth the factors to be considered by trial courts in imposing fines for criminal contempt and noted that "[b]ecause of the nature of these standards, great reliance must be placed upon the discretion of the trial judge." See also Green v. United States, 356 U.S. 165, 188, 78 S.Ct. 632, 2 L.Ed.2d 672 (1958); Jewel Tea Co. v. Kraus, 204 F.2d 549, 551 (7th Cir. 1953).

In the present case, Chief Judge Robson carefully followed the standards delineated in *United Mine Workers*. We find no abuse of discretion in the amount of the fines.

We have considered the other contentions raised by Greyhound in this appeal and find them to be without merit.

Affirmed.